ALLIED DELIVERY SYSTEM, INC., Appellee, *v.* ILLINOIS COMMERCE COMMISSION, Appellant.

First District (5th Division)    No. 79-2079

Opinion filed February 20, 1981.

Tyrone C. Fahner, Attorney General, of Chicago (Hercules F. Bolos, Special Assistant Attorney General, and Ronald L. Drozdzik, Assistant Attorney General, of counsel), for appellant.

James C. Hardman, of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiff, Allied Delivery System, Inc. (Allied), filed an appeal in the circuit court under section 18—900 of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—900 (adopting Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72)), seeking a reversal of the Illinois Commerce Commission's (the Commission) denial of Allied's application for a contract carrier permit to American Delivery System, Inc. (A.D.S.), a freight forwarder. The Commission had originally granted this application, but upon reconsideration denied it. The circuit court reversed the decision of the Commission as "against the manifest weight of the evidence" and remanded the matter with directions to reinstate its original order granting plaintiff's application.

On appeal to this court, the Commission contends that its findings in denying the application of Allied were supported by sufficient evidence. In addition, the Commission contends that the circuit court did not have the power to remand the matter with directions to the Commission to enter a specific order. In its final order denying Allied's application, the Commission concluded that the definitional requirement of section 18—100(10) of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(10)) that a binding bilateral contract exist between the contract carrier and the shipper could not be satisfied here because there would be no mutuality of obligation where the shipper is a freight forwarder. Additionally, the Commission held that the public interest, which was commanded by the Legislature to promote (Ill. Rev. Stat. 1972, ch. 95½, par. 18—302), would not be served by granting a contract carrier permit to Allied. This conclusion rests on the findings of the Commission that: (1) the protection of the public from preferences and discrimination in rates charged by motor carriers of property (Ill. Rev. Stat. 1977, ch. 95½, par. 18—313) would be eviscerated; (2) the public would be exposed to financial loss because the proposed service would not be required to carry insurance for the cargo shipped intrastate; and (3) the common ownership of Allied and the prospective freight forwarder, A.D.S., violates the public interest. These findings form the basis of this appeal.

Before proceeding to a presentation of the facts, we believe a brief discussion of the terminology employed in this area of law is essential to a thorough understanding of this case.

The Illinois legislature placed in the Commission the duty to supervise

and regulate the carriage of property by motor vehicle within Illinois. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—201.) Under the Illinois Motor Carrier of Property Law, there are two types of motor carriers of property: common carriers and contract carriers. (Ill. Rev. Stat. 1977, ch. 95½, pars. 18—100(9), (10).) Operation of a motor vehicle in the intrastate transportation of property for hire as either a common carrier or a contract carrier requires a permit of authority issued by the Commission. (Ill. Rev. Stat. 1977, ch. 95½, pars. 18—301, 18—302.) In essence, a common carrier serves the needs of the general public in the transportation of property in this State. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(9).) Common carriers are prohibited from unjustly discriminating or establishing undue or unreasonable preferences "to any particular person, port, gateway, locality, or description of traffic." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—313.) The rates charged by a common carrier for its services must be just and reasonable (Ill. Rev. Stat. 1977, ch. 95½, par. 18—310), and a schedule of those rates must be filed with the Commission. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—501). Finally, a common carrier is required to carry insurance to protect its shippers from loss or damage to the cargo. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—701.) In comparison, a contract carrier is a motor carrier of property for hire that serves the needs of individual shippers "under individual written bilateral contracts." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(10).) Thus, a contract carrier serving a particular type of shipper is not required to serve the general public. Contract carriers are not bound by the prohibition against discrimination and preferences in rates and are not required to carry insurance on cargo shipped by it. In short, the relationship between a contract carrier and its shippers is determined by the individual contracts between the two.

Freight forwarders fill a different function than do common carriers and contract carriers. A freight forwarder generally serves to collect individual shipments from the public, consolidate these shipments, arrange for their shipment by motor carriers, break down the shipments at destination, and arrange for shipment distribution to the proper consignees. The Interstate Commerce Commission regulates the operation of freight forwarders in interstate commerce. (49 U.S.C. §1003 (1976).) In intrastate commerce inside Illinois, however, a freight forwarder is not regulated by the Commission. We also note that a freight forwarder conducting operations in interstate commerce is required by the Interstate Commerce Commission to carry cargo insurance. 49 C.F.R. §1084.

A hearing was held on Allied's application, and the following evidence was adduced. At the time of Allied's application to the Commission, A.D.S., acting under a permit issued by the Interstate Commerce Commission, was a freight forwarder of general commodities in interstate commerce through the use of common carriers. A.D.S. was then serving

interstate shippers in Illinois by virtue of this permit. According to its president, Alvin Wasserman, A.D.S. specialized in the shipment of small packages on either an interstate or intrastate basis. In its operations, A.D.S. is responsible for the transportation of the property from the time it is tendered to it at the point of origin until it is tendered to the consignee at the point of destination. It also selects the motor carrier to be used in the transportation of the property. Wasserman also stated that he and his family have the controlling stock in A.D.S., and that he is sole shareholder of Allied.

Under a permit issued by the Interstate Commerce Commission, Allied acts as a common carrier for A.D.S. on an interstate basis in Illinois. George Taylor, general manager of Allied, stated that Allied seeks to become a specialist in the transportation and delivery of small shipments. To that end, Allied uses 16-foot vans which are geared to small shipments and operate efficiently in congested metropolitan areas. A financial statement offered by Allied reveals that as of July 30, 1976, it had total assets of $929,810.35 and total liabilities of $47,101.19.

A.D.S., in the view of Alvin Wasserman, hopes to become a competitor to United Parcel Service in the transportation of small shipments throughout the nation. Based on its experience, A.D.S. believes that employment of regular route common carriers will not assist it in achieving this goal. In addition, Wasserman believes that the use of the same carrier on both an intrastate and interstate basis will allow it to achieve the necessary economic efficiency to compete on a national level. A.D.S. has contacted an extremely large number of carriers, who hold both intrastate and interstate authority, to serve as their carrier, but has not met with success. In addition, Wasserman recounted the long history of problems A.D.S. has encountered with use of other carriers in Illinois. These problems apparently arose out of the inability of these carriers to handle the large volume and geographical reach of the business tendered them by A.D.S. Consequently, A.D.S. seeks the service of a carrier with the authority and ability to serve all of Illinois. Wasserman added that it would be efficient and economical if this carrier also served A.D.S. on an interstate basis. He stated: "In this way we can establish some consistency of policy and operational procedure no matter what point we are serving. It would facilitate the tracing of shipments, assuring that the carrier is stable and other matters of this nature, including offering consistent, expeditious transit times." A.D.S. is seeking the service of a contract carrier because under this relationship it can be assured that the contract carrier's vehicles are continuously available. Allied alone will fill this need, and, if granted this permit, the public will benefit by establishment of an efficient and cheap transportation system of small packages throughout Illinois and the country.

Evidence was also offered as to the volume of interstate business A.D.S. presently has in Illinois and the volume of intrastate business expected if granted this permit. Fifty-two Illinois shippers, who have previously tendered Allied interstate business, have indicated that they would also tender A.D.S. intrastate business within Illinois. Moreover, numerous shippers have contacted A.D.S. seeking its service on an intrastate basis within Illinois. In Wasserman's opinion, the need for this proposed intrastate service is present.

On April 27, 1977, the Commission entered an order granting Allied a permit to operate as a contract carrier for A.D.S. under section 18—302 of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302). The order specifically stated that Allied was "fit, willing and able to provide the proposed service." A permit, however, was never issued to Allied because on June 15, 1977, the Commission reopened this matter under section 18—900 of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—900, adopting Ill. Rev. Stat. 1977, ch. 111 2/3, par. 71). A second hearing was held on July 15, 1977, and new evidence was offered by expert witnesses presented by Allied. According to these witnesses, a freight forwarder is required to carry cargo insurance for interstate shipments, but not for intrastate shipments. Where an intrastate shipment through a freight forwarder is involved, the regulated motor carrier is the only source for insurance coverage of the cargo. Also, a consignor or consignee of a shipment would be a third-party beneficiary of any contract between the motor carrier and the freight forwarder regarding insurance coverage of the property.

After receiving this evidence, the Commission on January 25, 1978, entered an order vacating its previous order of April 27, 1977, granting the permit to Allied. The order also denied Allied's application for a contract carrier permit. The Commission stated that a contract carrier and a freight forwarder could not enter a bilateral contract as required by section 18—100(10) of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(10)), and, therefore, granting of a contract carrier permit to Allied would be neither proper nor consistent with public policy. In explaining this conclusion, the Commission stated:

"Under a grant of the sought authority, A.D.S. would be required to enter into a bilateral contract with Applicant [Allied] obligating itself to tender Applicant a specified amount of freight for transportation. However, A.D.S. cannot determine what freight it will have control over for routing with the Applicant. Only if shippers choose to use the service A.D.S. offers will it have freight to tender to Applicant. Since it has no control over the amount of freight shippers will tender it for forwarding service it is not a proper

contracting party under the law. Therefore the proposed service is not in the public interest and the application should be denied."

The above reason formed the basis of this order denying Allied's application.

Allied filed on March 7, 1978, a petition for rehearing with the Commission. The petition was granted, and on July 26, 1978, the Commission entered its order on rehearing, which again denied Allied's application. In this order, the Commission confirmed its previous finding that Allied and A.D.S. could not enter into a binding bilateral agreement, and, therefore, the granting of a permit would be improper under section 18—100(10) of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(10)) and detrimental to the Commission's duty to foster sound economic conditions under section 18—101 of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—101). Moreover, the Commission found, as a matter of policy, that the public interest, which is the standard set forth in section 18—302(10) of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302), would be injured if a contract carrier was authorized to serve a freight forwarder. The specific findings of the Commission are:

> "* * * [I]n light of the common carrier characteristic of a freight forwarder, the specialized types of service rendered by a contract carrier, the affiliation that exists between the Applicant and A.D.S., and the need for the Commission to assure that the general shipping public, whose goods are transported by motor carriers, have their shipments protected against damage during such shipment, it is not in the public interest, the standard set forth in Section 18—302 of the law, to authoriz [sic] a contract carrier to serve a freight forwarder."

Summarizing, it can be said, and as the Commission has argued before us, that three distinct reasons support this determination: first, the public's protection against preferences and discrimination in rates by a common carrier would be defeated by the proposed service; second, the public would be exposed to financial loss because the proposed service would not be required by law to carry cargo insurance; and third, the public interest would be detrimentally affected by the common ownership of a freight forwarder and its contract carrier.

Allied appealed this order of the Commission to the circuit court under section 18—900 of the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—900, adopting Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72). On July 24, 1979, the circuit court found the Commission's order on rehearing to be against the manifest weight of the evidence. The circuit court reversed the decision of the Commission and

remanded the matter with directions to the Commission to reinstate its order of April 27, 1977, granting Allied a contract carrier permit.

Two threshold questions lie before us at this point: one, what are the standards which govern the Commission's decision to grant or deny a permit for contract carrier authority and two, what is the scope of review to be employed by the courts in passing on a Commission decision. With regard to the standards governing the Commission's decision, we must, of course, look to the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100 *et seq.*). Guidance is first found in the expression of Illinois public policy in relation to the transportation of property embodied in section 18—100 (Ill. Rev. Stat. 1977, ch. 95½, par. 18—101). This section provides in pertinent part that:

> "It is hereby declared to be the policy of the State of Illinois to supervise and regulate the business of the transportation of property for-hire by motor vehicle upon and over the public highways of this State in such manner as to (1) recognize and preserve the inherent advantage of, and foster sound economic conditions in, such transportation and among such carriers in the public interest: (2) promote adequate, economical, and efficient service by such motor carriers * * *." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—101.)

This policy must be considered in conjunction with the express standards for granting a contract carrier permit as stated in section 18—302 (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302). In pertinent part, this section provides:

> "The Commission shall issue a permit to any qualified applicant therefor after hearing, * * *, if it is found that the applicant is fit, willing and able properly to perform the service proposed * * * and that the proposed service, to the extent authorized by the permit, will in the judgment of the Commission be consistent with the public interest * * *." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302.)

This section also provides: "The order of the Commission granting or denying a permit shall set forth the specific findings of fact on which such order is based." (Ill. Rev. Stat. 1977, ch. 95½, par. 18-302.) It was within these boundaries that the Commission should have centered its decision to deny Allied's application.

Appeal of a decision by the Commission to the Illinois courts is governed by section 68 of "An Act Concerning Public Utilities" (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72), adopted by reference into the Illinois Motor Carrier of Property Law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—900). The statute provides in pertinent part that " * * * any person or corporation affected by such rule, regulation, order or decision, may appeal to the circuit court * * * for the purpose of having the reasonableness or lawfulness of the rule, regulation, order or decision inquired into and

determined." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72.) The statute provides for additional guidelines for appellate review of a Commission decision as follows:

"* * * The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; and a rule, regulation, order or decision of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission for and against such rule, regulation, order or decision, or that the same was without the jurisdiction of the Commission." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72.)

As the Commission points out in its brief before this court, the Illinois Supreme Court has elaborated on the meaning of the terms "reasonableness" or "lawfulness" as used in this statute. In *Eagle Bus Lines, Inc. v. Illinois Commerce Com.* (1954), 3 Ill. 2d 66, 119 N.E.2d 915, the supreme court set forth the test for determining the reasonableness of a Commission decision. The court stated:

"To reverse and set aside an order on the ground that it is unreasonable it must be an arbitrary action, not resting on a reasonable basis for the exercise of the discretionary powers of the commission." (*Eagle Bus Lines, Inc. v. Illinois Commerce Com.* (1954), 3 Ill. 2d 66, 75, 119 N.E.2d 915, 920.)

With regard to the lawfulness of a Commission decision, our supreme court has said:

"In reviewing an order of the Commission, the courts are limited to a consideration of the questions of whether the Commission acted within the scope of its authority, whether it made [proper] findings * * * and whether constitutional rights have been infringed by the decision." *Citizens Utilities Co. v. Illinois Commerce Com.* (1971), 50 Ill. 2d 35, 39, 276 N.E.2d 330, 332.

■■ Where the Commission enters an order granting or denying an application for a contract carrier permit, it must also make specific findings of fact which support its decision. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302; see also Ill. Rev. Stat. 1977, ch. 111 2/3, par. 69.) It is well established that when an administrative agency is required to make findings of fact as a condition precedent to an order, the validity of that order rests upon the necessary finding. (*Rockwell Lime Co. v. Commerce Com.* (1940), 373 Ill. 309, 26 N.E.2d 99, *cert. denied* (1940), 311 U.S. 660, 85 L. Ed. 2d 423, 61 S. Ct. 16; *Ford v. Environmental Protection Agency* (1973), 9 Ill. App. 3d 711, 292 N.E.2d 540.) These findings must be specific enough to enable the courts to review intelligently the decision of the Commission. (*Gulf Transport Co. v. Illinois Commerce Com.* (1948),

402 Ill. 11, 83 N.E.2d 336.) Accordingly, these findings must be of fact, and not mere conclusions. (*Gulf Transport Co. v. Commerce Com.*) And the evidence before the administrative agency must substantially support the findings. *United Cities Gas Co. v. Illinois Commerce Com.* (1970), 47 Ill. 2d 498, 265 N.E.2d 608.

■■ In its briefs and arguments before this court, the Commission has sought to convince us of the limited and narrow range of review open to us. As can be seen from the foregoing discussion, our review of the Commission's decision is indeed limited, but not to the point advocated by the Commission. Judicial review is not a rubber-stamp process. Under the present state of the law, our courts still have the power and duty to scrutinize the actions of State agencies to determine if they are lawful and reasonable. Thus, in the present case, we will examine the Commission's decision to determine whether it is supported by the evidence adduced in its hearings.

■■ First, the Commission concluded that a contract carrier and a freight forwarder could not enter into a bilateral written contract, and therefore under section 18—100(10) (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(10)), Allied could not qualify as a contract carrier. Since A.D.S. could not guarantee that the public would tender it business, necessitating the employment of Allied as a carrier, the Commission reasoned that no mutuality of obligation could exist between Allied and A.D.S. As a general principle of contract law, a bilateral contract requires mutuality of obligation. (*E.g.*, *Carter v. Kaskaskia Community Action Agency* (1974), 24 Ill. App. 3d 1056, 322 N.E.2d 574.) This conclusion, as the Commission conceded here, ignores the present acceptance by the courts of "output" or "requirement" contracts as enforceable bilateral contracts. For example, a requirement contract exists when the seller agrees to supply goods to fill the buyer's entire requirement during a period of time. The contract appears to lack mutuality of obligation because the buyer is free to avoid the contract by not ordering any goods from the seller. The courts, however, have upheld these contracts by reading into the contract a requirement that the buyer exercise good faith and best efforts to provide the seller with business. (See, *e.g.*, *Hall v. Gruesen* (1959), 22 Ill. App. 2d 465, 161 N.E.2d 345; *W. P. Iverson & Co. v. Dunham Manufacturing Co.* (1958), 18 Ill. App. 2d 404, 152 N.E.2d 615; see also 1 Williston, Contracts §104.) Similarly, in the present case, an enforceable bilateral contract may exist between a contract carrier and a freight forwarder by implying into the contract a duty upon the freight forwarder to use good faith and best efforts to generate business for the contract carrier. Thus, the Commission's decision that Allied and A.D.S. could not enter into a bilateral contract is erroneous.

An alternative argument on this point has been offered by the

Commission. Citing its duty to "foster sound economic conditions" in the business of intrastate motor transportation of property (Ill. Rev. Stat. 1977, ch. 95½, par. 18—101), the Commission claims an applicant for a contract carrier permit must establish a "degree of probable viability" of the proposed service to receive the permit. Since Allied and A.D.S. could not assure the Commission of a minimal amount of business, the Commission denied Allied's application. We believe the evidence before the Commission does not support this position. A.D.S. had numerous present customers who had indicated a desire to use A.D.S. for intrastate transportation business. This list of customers would provide the proposed service an excellent starting base from which to grow. In addition, numerous shippers throughout Illinois had responded to advertisements of A.D.S., indicating a desire to use A.D.S. for intrastate shipments. Finally, both Allied and A.D.S. were experienced in this business, and Allied had sufficient financial stability to begin this enterprise. Thus, all of the evidence before the Commission indicates, at the very least, that the proposed service possessed "a degree of probable viability."

The remaining three arguments advanced by the Commission are based on the "public interest" standard governing its determination to grant or deny a contract carrier permit to Allied. In its first argument, the Commission maintains that granting a contract carrier permit to Allied to serve a freight forwarder, A.D.S., would emasculate the public's protection from discriminatory and preferential rate changes found in section 18—313 (Ill. Rev. Stat. 1977, ch. 95½, par. 18—313). This statute provides:

> "It shall be unlawful for any common carrier by motor vehicle engaged in intrastate commerce to make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, gateway, locality, or description of traffic in any respect whatsoever, or to subject any particular person, port, gateway, locality, or description of traffic to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—313.)

Thus, while common carriers are presently prohibited from charging discriminatory rates or establishing preferential treatment of shippers, contract carriers are not presently affected by this prohibition. Assuming that Allied obtained a contract carrier permit to serve A.D.S., a freight forwarder, the Commission believes the following scenario would occur. Allied would be able to reach the business of the general public through the conduit of a freight forwarder. This proposed service, Allied as contract carrier and A.D.S. as freight forwarder, would not be bound by the above prohibition. Consequently, the proposed service would be able to undersell existing common carriers on certain routes and types of

property with the end result of driving many common carriers out of the market. Without regulated common carriers, the public would be exposed to unreasonably high rates on certain routes and types of property. Thus, the Commission claims that the public interest would not be served by granting Allied a contract carrier permit to serve a freight forwarder.

We would first note that the Commission's position is not based on existing fact but upon conjecture. The speculation indulged in by the Commission is clearly an unsatisfactory and unacceptable basis for its decision. Assuming, however, that such a scenario should come to pass, we believe the Commission still retains two tools by which it may preserve viable common carriers and its beneficial role for the public. First, the Commission alone has control over the number of carriers it may license as contract carriers to serve freight forwarders. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302.) By limiting the number of contract carrier-freight forwarder relationships, the Commission can, should the need arise, effectively minimize the adverse effects on the business of common carriers brought about by competition with contract carrier-freight forwarder services. Second, the Commission has the power to establish reasonable limitations on the rates charged between a contract carrier and its shipper. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—201(2).) If the contract carrier-freight forwarder relationship poses a real threat to the survival of common carriers, then the Commission, through this power, may raise the minimum contractual rates the contract carrier may charge its freight forwarder. This would curtail the ability of the contract carrier-freight forwarder service to undersell common carriers. In our opinion, the Commission's finding that the proposed service, Allied as contract carrier and A.D.S. as freight forwarder, would destroy the public's protection from discriminatory rates and preferential treatment is erroneous and without evidentiary support.

The Commission next found that the public would be exposed to financial loss if the proposed service was granted authority to act in Illinois. As we have noted before, neither a freight forwarder nor a contract carrier is required by Illinois law to carry cargo insurance on intrastate shipments. A shipper using the proposed service for an intrastate shipment would have no insurance funds from which it could make a claim for loss of, or damage to, its property. Rather, the shipper would be entirely dependent upon the financial condition of the contract carrier and the freight forwarder to satisfy its claim. According to the Commission, this is an unacceptable position. The Commission, therefore, under its duty to protect the public interest, denied Allied's application.

■■ Under the present law, only common carriers are required to carry cargo insurance on intrastate shipments of property. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—701.) A shipper therefore has two choices: one, to use a

common carrier who charges uniform rates and carries cargo insurance; and two, to use an eligible contract carrier whose rates are set by the contractual agreement and who is not required to carry cargo insurance. Thus, a shipper may choose to risk shipment by a contract carrier without cargo insurance in return for a lower rate. Obviously, the legislature could have required contract carriers, as well as common carriers, to carry cargo insurance, but the legislature apparently felt that the shipping public would be best served by a choice. Therefore, shipments of property without requiring insurance was not found by the legislature to be against the public interest. In the present case, the Commission believes that the public interest can only be served by requiring cargo insurance, a belief not shared by the legislature. In our opinion, the Commission's stand on this point is not consistent with its role of administering the public policy of this State as expressed by the legislature in the Illinois Motor Carrier of Property Law. Rather, the Commission here had tried to impose its will on the law. This decision by the Commission exceeds its lawful authority, and is therefore erroneous. *Citizens Utilities Co. v. Illinois Commerce Com.* (1971), 50 Ill. 2d 35, 276 N.E.2d 330.

■■ ■ The final point raised by the Commission involves the common ownership of Allied and A.D.S. In its order on rehearing, the Commission stated: "In light of * * * the affiliation that exists between applicant and A.D.S. * * * it is not in the public interest * * * to authoriz [sic] a contract carrier to serve a freight forwarder." Standing alone this is not a finding of fact, but a mere conclusion which cannot support the Commission's decision. (*Gulf Transport Co. v. Illinois Commerce Com.* (1948), 402 Ill. 11, 83 N.E.2d 336.) In its brief before this court, the Commission claims that this finding is supported by policy considerations stated in a letter dated February 25, 1940, by Joseph B. Eastman, a then commissioner at the Interstate Commerce Commission, to the United States House of Representatives' Committee on Interstate and Foreign Commerce. In his letter, Mr. Eastman expressed the following policy considerations with regard to the regulation of freight forwarders:

"The thought behind these provisions is that a forwarding carrier, to be most useful to the public, should stand on its own feet and be free to utilize the instrumentalities and services of other common carriers subject to the Act as the best interests of its service may demand. It should not, by reason of control or affiliation, be an agency for the promotion of the special interests of a railroad or a motor carrier or any other carrier. Essentially, a forwarding company is like an express company or the parcel post, a mechanism for the economical and efficient handling of merchandise or package freight, and it can perform this function best if it is

divorced from serving the special interests of any particular hauling carrier or carriers. The control of certain forwarding companies by railroads or motor carriers has been one of the most objectionable and troublesome features of forwarding operations." Although the Commission is free to employ valid policy considerations in rendering a decision to grant or deny a contract carrier permit, these policy considerations must have some factual support in the evidence before the Commission. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302; *Gulf Transport Co. v. Illinois Commerce Com.* (1948), 402 Ill. 11, 83 N.E.2d 336.) To our knowledge, neither the record before the Commission nor the express factual findings of the Commission provide any support for the conclusion that the common ownership of both the contract carrier and the freight forwarder in the proposed service would be detrimental to the public's interest. Eastman's letter speaks in terms of conclusions without concrete factual support. For these reasons, the Commission's decision on this ground cannot be supported.

■■ The final issue raised by the Commission is the power of the circuit court to remand this matter to the Commission with directions to reinstate its previous order. Upon appeal from an order of the Commission, the circuit court exercises a statutory appellate jurisdiction, and its powers are restricted to those expressly delegated. (*Thompson v. Illinois Commerce Com.* (1953), 1 Ill. 2d 350, 115 N.E.2d 622.) Under section 68 of "An Act Concerning Public Utilities" (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72), the circuit court only has the power to take one of three actions: one, affirm the decision of the Commission; or, two, reverse and set aside the decision of the Commission; or, three, remand the matter to the Commission with directions to receive evidence which should have been considered at the previous hearing. Since the circuit court found that the Commission's decision was unlawful and unreasonable, it only had the power to set that decision aside. *Thompson v. Illinois Commerce Com.*

Accordingly, the order of the circuit court reversing and setting aside the Commission's decision denying Allied's application is affirmed. The court's further order remanding the matter with directions to reinstate the previous order is reversed. The cause is remanded to the circuit court with directions to remand to the Commission for further proceedings not inconsistent with this court's opinion.

Affirmed in part; reversed in part and remanded with directions.

SULLIVAN, P. J., and MEJDA, J., concur.