BRINK'S, INCORPORATED, *et al.*, Plaintiffs-Appellees, *v.* ILLINOIS COMMERCE COMMISSION, Defendant-Appellant.—(WELLS FARGO ARMORED SERVICE CORPORATION, Intervening Defendant-Appellant.)

First District (4th Division)   No. 80-2892

Opinion filed December 31, 1981.—Rehearing denied March 4, 1982.

Tyrone C. Fahner, Attorney General, of Chicago (Hercules F. Bolos, Mary C. Ubatuba, and Thomas J. Russell, Assistant Attorneys General, of counsel), for appellant Illinois Commerce Commission.

Howard Arvey, Nathan M. Cohen, Charles J. O'Connor, and Donald F. Spak, all of Arvey, Hodes, Costello & Burman, of Chicago, and David E. Wells, of Atlanta, Georgia, for appellant Wells Fargo Armored Service Corporation.

Thomas G. Lyons, Daniel W. Coyne, and Patrick L. Moore, all of O'Keefe, Ashenden, Lyons and Ward, of Chicago, for appellee Brink's, Incorporated.

Thomas J. Heneghan, of Rock, Fusco, Reynolds and Heneghan, and Michael F. Sheehan, Jr., of Deming and Sheehan, both of Chicago, for appellee Purolator Security, Incorporated.

JUSTICE JOHNSON delivered the opinion of the court:

Appellants, Illinois Commerce Commission (Commission) and Wells Fargo Armored Service Corporation (Wells Fargo), appeal the decision of the circuit court of Cook County setting aside a Commission order granting a contract carrier permit to Wells Fargo.

On June 18, 1976, Wells Fargo applied to the Commission for a permit under section 18—302 of the Illinois Vehicle Code (Ill. Rev. Stat. 1975, ch. 95½, par. 18—302) to operate as a contract carrier of valuable property in armored vehicles in Cook, Lake, Du Page and Will Counties. Pursuant to Commission rule, six existing carriers were allowed to intervene and those intervening included Brink's, Incorporated (Brink's), Purolator Security, Incorporated, and Purolator Courier Corporation.

Hearings were held during 1976, 1977 and 1978, generating over 7000 pages of transcript. The record was marked "heard and taken" on February 9, 1978. The full Commission considered oral arguments on September 27, 1978. On May 16, 1979, the Commission granted the application and issued a contract carrier permit to Wells Fargo. Brink's and Purolator Security appealed to the circuit court of Cook County and requested a stay of the Commission's order. The stay was allowed, and the stay order was affirmed on appeal. (*Brink's, Inc. v. Illinois Commerce Com.* (1979), 79 Ill. App. 3d 275, 398 N.E.2d 296.) On October 17, 1980, the circuit court set aside the order of the Commission for the reasons set forth in its decision on review. Wells Fargo and the Commission appealed.

Appellants present the following issues for review: (1) whether prior

to issuing a contract carrier permit, section 18—302 of the Illinois Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302) requires the Commission to make express findings concerning (a) unmet shipper needs for carrier service and (b) the inadequacy of existing service; (2) whether the Commission's order contains findings concerning shipper needs for armored carrier services; (3) whether the trial court erred in taking judicial notice of matters outside the Commission's certified record, over objection, without an opportunity for rebuttal, and in disregard of evidence of record; (4) whether the Commission's order is lawful and reasonable; and (5) whether Brink's and Purolator have standing to appeal the Commission's order.

We reverse.

LAW OF COMMON AND CONTRACT CARRIERS

Before discussing the issues raised by this appeal, it is appropriate that we discuss the definitions and law of common and contract carriers.

A contract carrier is defined as "any person, *who under individual written bilateral contracts,* transports property over the highways of this State by motor vehicle for-hire." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(10).) This contrasts with the definition of common carrier which is "any person who undertakes to transport property over the highways of this State *for the general public* by motor vehicle for-hire, whether over regular or irregular routes." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(9).

Common carriers serve the needs of the general public. They are prohibited from unjustly discriminating or establishing undue or unreasonable preferences to any person, place, or "description of traffic." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—313.) Their rates must be just and reasonable (Ill. Rev. Stat. 1977, ch. 95½, par. 18—310), and a schedule of those rates must be filed with the Commission (Ill. Rev. Stat. 1977, ch. 95½, par. 18—501). Finally, common carriers must carry insurance to protect shippers from loss or damage to cargo. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—701.) In contrast, contract carriers serve particular types of shippers and are not required to serve the general public. They are not bound by the prohibition against discrimination and preferences in rates and are not required to carry insurance on cargo. In short, the individual contract determines the relationship between a contract carrier and its shipper. *Allied Delivery System, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 656, 659, 417 N.E.2d 777, 779-80.

■■ Different standards govern the issuance of certificates to common carriers and permits to contract carriers. The standard for issuance of certificates to common carriers is public convenience and necessity. Section 18—301 provides in pertinent part that:

"(a) * * * [I]t shall be unlawful for any *common carrier* of property by motor vehicle to operate * * * without first having obtained from the Commission a certificate * * * declaring that *public convenience and necessity* require such operation. The Commission shall issue a certificate to any qualified applicant therefor after hearing, pursuant to an application filed, authorizing the whole or any part of the operation covered by the application, and may attach to the exercise of the rights and privileges granted by such certificate such terms and conditions as the *public convenience and necessity* may require, if it is found that the applicant is fit, willing and able properly to perform the service proposed and to conform to provisions of this Chapter and the requirements, rules and regulations of the Commission thereunder, and that the proposed service, to the extent authorized by the certificate, is required by the present and future *public convenience and necessity*; otherwise such application shall be denied. In determining whether or not a certificate of public convenience and necessity shall be issued, the Commission shall give due consideration among other factors as to whether or not the granting of the authority of the proposed service would recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest, and whether or not the granting of the authority for the proposed service would tend to promote safe, adequate, economical and efficient service by motor carriers of property for-hire, provided however, that the mere existence of a competing transportation service in the area sought to be served shall not in and of itself be proof sufficient to support a denial of the existence of the present or future *public necessity and convenience*. The order of the Commission granting or denying a certificate shall set forth the specific findings of fact on which such order is based." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 95½, par. 18—301.

In *McMann v. Illinois Commerce Com.* (1967), 38 Ill. 2d 126, 230 N.E.2d 197, our supreme court held that a finding of inadequate existing service was not essential to a Commission order granting a certificate of public convenience and necessity. In *McMann*, Springfield Van and Storage Co. had filed for a certificate to operate as a common carrier of household goods and used office furniture and equipment. The Commission granted the certificate finding the operation consistent with the public interest and that there was a present and future need for the proposed services. Plaintiffs, who had intervened to oppose the application, argued that such a grant of authority required a specific finding of

inadequacy of existing service. In affirming the Commission order, our supreme court stated:

"The requirement of a Commission finding that existing service is inadequate was developed in those cases where existing carriers or utilities have been held to be entitled to territorial protection under the so-called 'first in the field' doctrine. [Citations.] This theory is based on a consideration of the time and money expended by the pioneer in developing its business and rendering adequate service to the public. [Citations.]

Cases requiring specific findings of inadequacy involved common carriers over regular routes only or utilities confined to a definite area such as electric, gas, water or sewer service. The authority here sought is to provide service over irregular routes all over the State of Illinois. Plaintiffs have not cited nor have we found any case involving common carriers over irregular routes wherein a failure to make the specific finding of inadequacy of service by existing carriers resulted in a reversal of a Commission order. * * * The Commission did make a specific finding in its original order that the greater weight of the evidence established that other carriers in the same territory were unable to meet the public demand for such services, and in its order on rehearing it made a finding of need for additional service which implies an inadequacy of existing service. We do not think that the failure to make a specific finding of inadequacy was fatal to the Commission's order." 38 Ill. 2d 126, 128-29.

The standard for the issuance of permits to contract carriers is that the proposed service will be consistent with the public interest. Section 18—302 of the Act provides in pertinent part that:

"(a) * * * [I]t shall be unlawful for any contract carrier of property by motor vehicle to operate or furnish service * * * without first having obtained from the Commission· a permit * * *. The Commission shall issue a permit to any qualified applicant therefor after hearing, pursuant to an application filed * * * if it is found that the applicant is fit, willing and able properly to perform the service proposed and to conform to the provisions of this Chapter, and the requirements, rules and regulations of the Commission thereunder and that the proposed service, to the extent authorized by the permit, will in the judgment of the Commission *be consistent with the public interest*; otherwise such application shall be denied; * * *. In determining whether or not a permit shall be issued, the Commission shall give due consideration among other factors as to whether or not the granting of the

authority for the proposed service would recognize and preserve the inherent advantages of, and foster sound economic conditions in such transportation and among such carriers *in the public interest,* and whether or not the granting of the authority for the proposed service would tend to promote safe, adequate, economical, and efficient service by motor carriers of property for-hire; provided further, that the mere existence of a competing transportation service in the area sought to be served shall not in and of itself be proof sufficient to support a finding of inconsistency with the public interest. The order of the Commission granting or denying a permit shall set forth the specific findings of fact on which such order is based." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 95½, par. 18—302.

This court has interpreted section 18—302 of the Act in two recent cases. In *Allied Delivery System, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 656, 417 N.E.2d 777, this court addressed the issue of what standards govern the Commission's decision to grant or deny a permit for contract carrier authority. This court found guidance in the expression of Illinois public policy in relation to the transportation of property which is embodied in section 18—101. (93 Ill. App. 3d 656, 663.) This section provides in pertinent part as follows:

"It is hereby declared to be the policy of the State of Illinois to supervise and regulate the business of the transportation of property for-hire by motor vehicle upon and over the public highways of this State in such manner as to (1) recognize and preserve the inherent advantage of, and foster sound economic conditions in, such transportation and among such carriers in the public interest: (2) promote adequate, economical, and efficient service by such motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices: (3) improve the relations between and coordinate transportation by and regulation of, such motor carriers and other carriers: (4) develop and preserve a highway transportation system properly adapted to the needs of commerce and the state: and (5) co-operate with the federal government and the several states, and the duly authorized officials thereof, and with any organization of motor carriers in the administration and enforcement of the regulatory statute; * * *." Ill. Rev. Stat. 1977, ch. 95½, par. 18—101.

■■ Illinois public policy must be considered in conjunction with the express standards for granting a contract carrier permit as stated in section 18—302(a) (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302(a); *Allied*

*Delivery System, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 656, 663).

In *Carlson Transport, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 793, 416 N.E.2d 1239, this court held that section 18—302 required two findings for the issuance of a permit: (1) that the applicant is fit, willing and able to perform the service proposed, and (2) that the grant will in the judgment of the Commission be consistent with the public interest. (93 Ill. App. 3d 793, 795.) We noted that "While no Illinois Court has had to interpret the term 'consistent with the public interest' as utilized in section 18—302, other States accord that term a broad interpretation." (93 Ill. App. 3d 793, 796.) "Consistent with the public interest" has been held to mean not detrimental to the public and not contrary to public policy as set forth in the Motor Carrier Act. A showing of consistent with public interest is a lesser standard than the showing of public convenience and necessity required under section 18—301. The determination of what constitutes public convenience and necessity and what constitutes consistent with the public interest is within the discretionary powers of the Commission. The Commission's expertise in deciding what is consistent with public interest in petitions pursuant to section 18—302 must not be set aside unless it is clearly against the manifest weight of the evidence. 93 Ill. App. 3d 793, 796.

The principal issue raised by this appeal is whether the Illinois Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100 *et seq.*) requires the Commission to make express findings concerning unmet shipper needs and the inadequacy of existing service before issuing a contract permit.

In its order of May 16, 1979, the Commission made the following findings:

"(7) four officers and/or employees of Wells Fargo as well as eleven shipper witnesses from banks, savings and loan associations, retail department stores, a drug clinic, a jeweler, and other businesses appeared and testified in support of the instant application for a contract permit, * * *;

(8) nineteen witnesses who were employed in various capacities by the four intervening carriers appeared to oppose the application * * *;

(9) Dr. Leon N. Moses and Dr. Alfred A. Kuehn appeared and were allowed to testify as expert witnesses and each expressed his opinions to support the respective position of his client(s), including opinions as to the ultimate issues of the case, * * *;

(10) shippers reasonably seeking contract carriage are entitled to the personalized flexible service normally associated with contract

carriage, and the record shows that shippers who seek to use armored carrier service frequently have special needs for unscheduled service to meet unusual business contingencies, as well as particular time schedule requirements including a desire for either early or late pick-ups and deliveries to meet either cash flow or deposit credit requirements;

(11) the entry of Wells Fargo would result in more trucks available to serve the market and that would result in an increased supply of routes generally available throughout the four county area;

(12) with more routes throughout the area forming a tighter network, more potential users would necessarily be along routes and therefore would be more likely to obtain service to meet their needs;

(13) the testimony of the shipper witnesses, the statistical and econometric data admitted into evidence support the various opinions expressed by Wells Fargo's expert witness, Dr. Alfred A. Kuehn, and further show that there is a potential market for additional armored carrier service in the four county area and that the public interest will be served by the entry of another carrier which would be willing and able to provide a transportation service of these valuable commodities and which has sufficient experience and knowledge of the necessary security measures to provide such service safely and efficiently;

(14) the evidence discloses that there are other carriers operating within the Illinois Counties of Cook, Du Page, Lake and Will which are transporting the proposed commodities pursuant to individual written bilateral contracts with their shippers, engaging in competitive bidding, and providing a service similar to that proposed by Applicant;

(15) neither the evidence adduced by the intervening carriers nor the opinions expressed by their expert witness, Dr. Leon N. Moses, nor the arguments set forth in their attorneys' post hearing briefs, persuade the Commission that the entry of an additional carrier in the four county area will result in destructive competition that will cause a deterioration in service quality and consequent harm to these existing carriers and the shipping public;

(16) the evidence shows that a grant of contract carrier authority to Applicant is consistent with a public interest in that it will tend to promote safe, adequate, economical and efficient service by motor carriers; * * *."

The circuit court set aside the Commission order, stating:

"However, nowhere are there any findings by defendant Commission that there is a distinct need for the proposed contract

carrier service in the four county area, that the present contract carriers are unable or unwilling to meet that need or that a particular class or classes of shippers are in need of the specialized service proposed by Wells Fargo which the other carriers are unable or unwilling to perform.

\* \* \*

\* \* \* [I]f the Commission does not make findings of fact upon the principal issues, the Court cannot independently search the record to determine whether it discloses facts which if they had been found by the Commission, would sustain its decision. [Citation.]

\* \* \*

Although the Court could possibly remand the matter back to the Commission if it failed to consider evidence that the law required it to consider, the Court cannot remand where the Commission has failed to make essential findings. The only alternative permitted to a Court by law, is to reverse the order of the Commission."

■■ We find no support for the proposition that Illinois law requires express findings of unmet shipper needs and inadequate existing service before a contract carrier permit may be issued where the proposed service would compete only with services provided by other contract carriers. We have examined cases from other jurisdictions in which the grant or denial of a permit to operate as a contract carrier has been challenged.

*Indiana*

Indiana courts have decided that findings of distinct needs and inadequate existing service must be shown to justify the granting of a contract carrier permit. However, two points must be noted: (1) the applicable Indiana law requires such findings.

"In determining whether requested contract authority should be granted, the commission shall \* \* \* consider the following factors:

\* \* \*

(b) The effect of granting the requested authority on existing transportation, and particularly whether the granting of such authority will seriously impair such existing service and will unreasonably impair the efficient public service of any certificated common carrier by motor vehicle, or by railroad, then adequately serving the same territory;

(c) Whether or not any certificated common carrier by motor vehicle, or by railroad, then serving the same territory, will furnish

transportation services designed to meet the distinct need of the supporting contract shipper or shippers; * * *." (Ind. Code Ann. §8—2—7—20 (Burns 1981 Supp.).)

In contrast, Illinois law requires that the Commission consider

"* * * whether or not the granting of the authority for the proposed service would recognize and preserve the inherent advantages of, and foster sound economic conditions in such transportation and among such carriers in the public interest, and whether or not the granting of the authority for the proposed service would tend to promote safe, adequate, economical and efficient service by motor carriers of property for-hire * * *." (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302(a).)

And (2) the Indiana statute is concerned with the effect that a grant of contract carrier authority will have on existing common carriers not on other contract carriers. In the instant case, the Commission found:

"(14) the evidence disclosed that there are other carriers operating within the Illinois counties of Cook, Du Page, Lake and Will which are transporting the proposed commodities pursuant to individual written bilateral contracts with their shippers * * *."

Thus, other contract carriers but not common carriers would be affected by a grant of contract carrier authority to Wells Fargo.

The Indiana court first interpreted the minimal burden of proof necessary for a contract carrier permit in *Graves Trucking, Inc. v. B. G. Trucking Co.* (1972), 151 Ind. App. 563, 280 N.E.2d 834. The court noted that the statutory language governing contract carrier permits was the same or similar in Federal and Indiana statutes. Quoting *Interstate Commerce Com. v. J-T Transport Co., Inc.* (1961), 368 U.S. 81, 7 L. Ed. 2d 147, 82 S. Ct. 204, the Indiana court held that:

"The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants." (151 Ind. App. 563, 568-69, 280 N.E.2d 834, 837.)

The Indiana court further stated that:

"* * * [S]ome minimum standards of proof should be established to prevent the development of a practice whereby the supporting shippers may designate and select at will the carriers that they prefer to handle their commodities. This not only would work a great disadvantage upon the common carriers authorized to handle such commodities but would usurp the statutory duty of

the Public Service Commission of Indiana and circumvent the clear intent of the Legislature. Selection of a favorite contract carrier by shippers without some standards of proof to protect the public could eventually precipitate an erosion of common carrier service to the public which the statute prohibits." (151 Ind. App. 563, 572, 280 N.E.2d 834, 839.)

Again, we note that in requiring findings of need and inadequacy, the Indiana court was concerned with the effect on common carrier service not on other contract carriers. See also *Fred J. Stewart Trucking, Inc. v. Bunn Trucking Co.* (1972), 151 Ind. App. 157, 278 N.E.2d 310.

*North Carolina*

North Carolina requires a showing of need and inadequacy by rule of the Utilities Commission. Rule R2-15(b) provides:

"If the application is for a permit to operate as a contract carrier, proof of a public demand and need for the service is not required; however, proof is required that one or more shippers or passengers have a need for a specific type of service not otherwise available by existing means of transportation * * *." (*State ex rel. Utilities Com. v. American Courier Corp.* (1970), 8 N.C. App. 367, 374, 174 S.E.2d 808, 812-13.)

North Carolina law requires that the Utilities Commission consider among other factors:

"(2) Whether the proposed operations will unreasonably impair the efficient public service of carriers operating under certificates, or rail carriers,

* * *

(5) Whether the proposed operations will be consistent with the public interest * * *." N.C. Gen. Stat. §62—262(i) (1975).

In *State ex rel. Utilities Com. v. American Courier Corp.* (1970), 8 N.C. App. 367, 174 S.E.2d 808, American Courier, a contract carrier, challenged the grant of contract carrier authority to First Courier Corporation as not consistent with public interest. First Courier proposed to transport commercial papers, cash letters, audit and accounting media and other business records, documents and supplies used in processing. In upholding the grant of authority, the court stated:

"The protestant, American Courier Corporation, bases much of its opposition to the granting of the permit to the applicant on the ground that if the permit were granted it would then have competition in the area of transportation. Protestant contends that such competition should not be allowed since the granting of the proposed application would adversely affect the business of American Courier. We do not feel that this is a sufficiently

compelling reason to prohibit the entrance of other contract carriers in the field of transporting bank documents and other commodities. In *Utilities Commission v. Coach Co.*, 261 N.C. 384, 134 S.E.2d 689 (1964), our Supreme Court, speaking through Moore, J., said: 'There is no public policy condemning competition as such in the field of public utilities; the public policy only condemns unfair or destructive competition.' This Court, in the recent case of *Utilities Comm. v. Petroleum Carriers,* 7 N.C. App. 408, 173 S.E.2d 25 (1970), citing the above passage from the *Coach Co.* case, stated: 'The possibility that a transfer of authority to a more competitive carrier will adversely affect existing carriers does not make such a transfer contrary to "the public interest" as a matter of law.' So, too, in the present case, the Utilities Commission's action in authorizing the granting of the permit to the applicant does not denominate the competition generated by that action unfair or against the 'public interest.' " 8 N.C. App. 367, 375-76, 174 S.E.2d 808, 820.

Other North Carolina cases are *State ex rel. Utilities Com. v. Petroleum Transportation, Inc.* (1968), 2 N.C. App. 566, 163 S.E.2d 526; *State ex rel. Utilities Com. v. American Courier Corp.* (1970), 8 N.C. App. 358, 174 S.E.2d 814; *State ex rel. Utilities Com. v. Kenan Transport Co.* (1971), 10 N.C. App. 626, 179 S.E.2d 799.

*Alabama*

The Alabama Supreme Court has decided several cases in which a grant or denial of contract carrier authority has been challenged. (*Ross Neely Express, Inc. v. Hornady Truck Lines, Inc.* (Ala. 1980), 387 So. 2d 782; *Redwing Carriers, Inc. v. Alabama Public Service Com.* (Ala. 1978), 356 So. 2d 129; *Jefferson Trucking Co. v. Alabama Public Service Com.* (Ala. 1977), 347 So. 2d 372; *Alabama Public Service Com. v. Consolidated Transport Co.* (1970), 286 Ala. 323, 239 So. 2d 753; *Osborne Truck Lines, Inc. v. Alabama Public Service Com.* (1969), 284 Ala. 166, 223 So. 2d 284.) Alabama law requires the Public Service Commission to determine whether the proposed operation will be consistent with the public interest. (*Ross Neely Express, Inc.,* at 785.) This determination is made by applying a two-pronged test:

"[A] contract carrier permit should be issued when 1) a common carrier cannot extend the preferential service or other advantages of a contract carrier; and 2) the granting of such a permit will not tend to materially depreciate the ability of the protesting common carriers to serve the public." *Ross Neely Express, Inc.,* at 785.

As in the Indiana and North Carolina cases, Alabama law is concerned with protecting common carriers from competition, not with

protecting contract carriers from competition with other contract carriers. In *Osborne Truck Lines, Inc.,* the court commented that:

> "* * * [A]ny erosion or impairment of the financial ability of the common carriers to perform by taking away from them lucrative business and giving it to a contract carrier, particularly to enable the customer to meet competition, or possibly to gain some advantage, is not consistent with public interest. Such public interest as related to the business world is dependent on an adequate and efficient motorized common carrier system which should not be potentially weakened or impaired by the issuance of contract carrier permits that have a tendency to decrease the volume and remuneration of such carriers that is needed to sustain efficient common carrier service." (284 Ala. 166, 170, 223 So.2d 284, 288.)

*Nebraska*

In *Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp.* (1968), 183 Neb. 229, 159 N.W.2d 310, Samardick petitioned to engage in operations as a contract carrier of cash, letters, checks, and other commercial papers, data processing material and related documents and records. Its application was opposed by B.D.C., a common carrier. The applicable Nebraska law is similar to Illinois law. Nebraska law provides that a permit will be granted

> "* * * if the applicant is found to be fit, willing, and able to perform the service in accordance with statutory requirements and the rules and regulations of the commission, and that the operation authorized will be consistent with the public interest. In determining the question of public interest, the commission is required to consider the number of competing operators, and not the number of motor vehicle units being operated by competing operators." 183 Neb. 229, 236, 159 N.W.2d 310, 316.

The Nebraska court distinguished "consistent with public interest" from "public convenience and necessity":

> "The former means only that the proposed contract carrier service does not conflict with the legislative policy of the state in dealing with transportation by motor carriers, while the latter requires a consideration of the present service being rendered in the territory, the need of additional service, and the facilities which the applicant can provide. Consistent with the public interest simply means that it is not contrary to the public policy of the state as expressed in the Motor Carrier Act. [Citation.]
>
> It is the general rule that an applicant for a contract carrier permit must show that the proposed service is specialized and fits

the need of the contract shippers. If the service can be performed as well by common carriers a need for a contract carrier is not established. * * * The evidence as to where the public interest lies in the present case is in conflict. The determination of the public interest in such a case is one that is peculiarly for the determination of the commission." (183 Neb. 229, 237, 159 N.W.2d 310, 316.)

*Pennsylvania*

In *Brink's, Inc. v. Pennsylvania Public Utility Com.* (1981), 56 Pa. Commw. 371, 424 A.2d 1010, Brink's and Purolator appealed an order granting contract carrier authority to Pagerly Detective and Security Agency, Inc. on a theory that there was not substantial evidence of need. Pennsylvania law provides that:

"A permit shall be issued by the commission to any qualified applicant therefor authorizing in whole or in part the service covered by the application, if it appears * * * that the applicant is fit, willing and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this chapter and the lawful orders or regulations of the commission thereunder, and that the proposed service to the extent authorized by the permit will be consistent with the public interest and the policy declared in section 2501 * * *; otherwise such application shall be denied." 66 Pa. Cons. Stat. Ann. §2503 (Purdon 1979).

Section 2501 is a declaration of policy similar to that of Illinois. Section 2501 provides that the policy and intent of the Pennsylvania General Assembly is to regulate the service of common carriers in order to preserve their inherent advantages. The section additionally provides that:

"It is hereby found as a fact * * * that the service of common carriers * * * forwarders, contract carriers * * * are so closely interwoven and interdependent, and so directly affect each other, that in order effectively to regulate such common carriers by motor vehicle and forwarders and to provide a proper and safe highway transportation system in the public interest, it is necessary to regulate the service of such contract carriers * * *." 66 Pa. Cons. Stat. Ann. §2501 (Purdon 1979).

The Pennsylvania court interpreted the intent of the General Assembly:

"Clearly, the General Assembly intended to provide for the regulation of contract carriers only to the extent that such regulation is necessary to protect common carriers from harmful competition by contract carriers. It did not intend to protect contract carriers from competition among themselves, except to the extent

necessary to insure that one is not given an unfair advantage over another.

\* \* \*

In short, Chapter 25 of the Code authorizes limited regulation of contract carriers for the purpose of protecting common carriers from *harmful* competition by contract carriers. Chapter 25 of the Code also authorizes regulation of contract carrier rates, record keeping, and safety provision to prevent any one contract carrier from *unfairly* competing with common carriers or other contract carriers. When the PUC considers an application for contract carrier authority, it may consider only whether the applicant is fit, willing and able to perform the service and whether any common carrier will be harmed by the grant of authority." (56 Pa. Commw. 371, ___, 424 A.2d 1010, 1013.)

*Federal law*

Under Federal law, a contract carrier is a person

"\* \* \* providing motor vehicle transportation for compensation under continuing agreements with a person or a limited number of persons—(A) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (B) designed to meet the distinct needs of each such person." 49 U.S.C.A. §10102(12) (West 1979).

In deciding whether to grant a contract carrier permit, the Interstate Commerce Commission must find that a person is "fit, willing, and able" to undertake shipping responsibilities and that the service will be consistent with "the public interest and the transportation policy of Section 10101 of this title." (49 U.S.C.A. §10923(a) (West 1979).) In evaluating the applicant, the Commission must consider the number of shippers to be served, the nature of transportation to be provided, the effect that granting the permit would have on protesting carriers, the effect that denying the permit would have on the applicant, its shippers, or both, and the changing character of the requirements of those shippers. 49 U.S.C.A. §10923(b)(2) (West 1979).

National Transportation Policy is contained in section 10101 and states that the policy of the United States Government is

"(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reason-

able rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters; and

(6) to encourage fair wages and working conditions in the transportation industry." 49 U.S.C.A. §10101 (West 1979).

In *International Detective Service, Inc. v. Interstate Commerce Com.* (D.C. Cir. 1979), 613 F.2d 1067, the court of appeals extensively discussed statutory criteria for issuance of a contract carrier permit by the Interstate Commerce Commission. In *International Detective Service*, three related motor carrier cases were consolidated. Existing carriers had challenged grants of contract carrier permits to applicants. The court rejected the contentions of the protesting carriers. The court stated that armored carriers satisfied the Federal definition of contract carriers because they offered unique and specialized service "which, if expressly or impliedly limited to a class of persons, satisfies both the 'limited number of persons' and 'distinct need' requirements of [the law]." 613 F.2d 1067, 1074.

Although section 10923(b)(2) required consideration of certain factors,

"neither it nor the Administrative Procedure Act requires a detailed analysis of each and an explicit weighing of each against the other. The Commission's determination is adequate if logical processes in reaching that decision are reasonably discernible and the essential basic findings are revealed. * * * [the court] should uphold agency findings of 'less than ideal clarity' if satisfied from the determination that the administrators gave a 'hard look' at the relevant issues and if 'the agency's path may reasonably be discerned.' " 613 F.2d 1067, 1077.

The court held that Federal legislation of contract and common carriers reflected a careful balancing between common carrier rights and expansion of contract carriers. Congress did not intend to insulate existing common carriers from potential contract carrier competition. It was not sufficient to inquire into the adequacy and ability of an existing carrier to serve normal needs. "The 'distinct need' of the shipper may nonetheless not be served by existing services, if the new service is better tailored to fit the special requirements of a shipper's business, *the length of its purse*, or the select nature of the delivery service that is desired." *International Detective Service, Inc. v. Interstate Commerce Com.* (1st Cir. 1979), 613 F.2d 1067, 1076.

The court further held that "shippers' need for greater and more effective competition is the most significant element in determining the public interest and adherence to the National Transportation Policy * * *." 613 F.2d 1067, 1078.

In summary, in the cases examined where the applicant for contract carrier status has had to show that there was a need for the proposed service and that existing service was inadequate, these showings were mandated to protect common carriers from competition and not for the protection of other contract carriers. In *International Detective Service, Inc.*, Federal law was liberally construed to permit competition between common and contract carriers as in the public interest. In none of the cases examined did the court hold that an order granting contract carrier authority is fatally defective where the order fails to explicitly state that there were unmet needs and inadequate existing service.

There is only one Illinois case which is directly on point.

In *Carlson Transport, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 793, 416 N.E.2d 1239, Carlson Transport, a common carrier, challenged a grant of contract carrier authority to Edwin Meiers, doing business as Graphic Arts Express. Among the issues raised by Carlson Transport was whether a finding of inadequate or deficient service was required. The court rejected Carlson Transport's contention, stating:

"Carlson's reliance on Interstate Commerce Commission decisions and certain Illinois cases holding that a finding of inadequate or deficient service must be found by the Commission are inapposite. First, they involve common carrier certificates of 'public convenience and necessity,' which standard is more rigid than 'consistent with the public interest.' (*Be-Mac Transport Co. v. Illinois Commerce Com.*) Second, even as to a common carrier certificate of 'public convenience and necessity,' a finding of inadequate or deficient service is not required for granting of specialized authority over irregular routes. *McMann v. Illinois Commerce Com.* (1967), 38 Ill. 2d 126, 230 N.E.2d 197." 93 Ill. App. 3d 793, 796-97.

We hold that section 18—302 of the Illinois Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 18—302) does not require express findings of unmet shipper need for carrier service and the inadequacy of existing service prior to issuing a contract carrier permit. Even if we were to hold otherwise, that would not change the result of this appeal, since Wells Fargo proved unmet needs and inadequate service.

In its brief, Brink's argues that section 18—302 must be read in the light of Illinois public policy as stated in section 18—101. According to Brink's, an applicant for contract carrier authority must demonstrate a need for the proposed service. The essential plan of regulation, in Brink's view, is that

"only necessary services be permitted and unnecessary activities be prohibited. * * * [I]f the existing carrier is providing adequate service to meet the needs of the shipping public, the application

must be denied since to do otherwise would convert the statutory scheme from one of regulation to free entry and deregulation."

Brink's cites no authority, nor do we find any authority for this proposition. Furthermore, its argument ignores the distinctions between contract carriers and common carriers discussed above. We note that section 18—101 declares that Illinois policy is against "unfair or destructive competitive practices" not against competition itself.

In its order, the Commission summarized testimony received during the hearings. Testimony demonstrating inadequate service includes the following:

The treasurer of Barrett Jewelry testified that he would like to use an armored carrier to transport cash sale receipts but that his company could not arrive at mutually satisfactory terms with Brink's or Purolator.

The cashier and payroll manager of Carson, Pirie, Scott & Co. stated that Brink's and Purolator could not provide later pickup times.

The treasurer and chief financial officer of Belscot Retailers, Inc., testified that the company was dissatisfied with Purolator's pickup schedules.

The vice-president and cashier of Melrose Park National Bank said that the bank frequently needs unscheduled service for special shipments on short notice and its own employees have hand carried such shipments when armored service was not available.

The clinic director of the Center for Addictive Problems, Inc., stated that Brink's and Purolator informed her they could not provide for weekly pickup service after 6 p.m. Friday or by 1 p.m. Saturday.

This and other testimony clearly established that the service provided by appellees was inadequate and that shippers had needs which were not met by appellees. In its findings, the Commission stated that "shippers who seek to use armored carrier service frequently have special needs for unscheduled service to meet unusual business contingencies," that the entry of Wells Fargo would result in "an increased supply of routes generally available," and that with more routes "more potential users would necessarily be along routes and therefore would be more likely to obtain service to meet their needs." The Commission also found that there was a potential market for additional armored carrier service and that the public interest will be served by the entry of another carrier into the market.

■■ The standard for review of Commission orders is found in section 68 of the Public Utility Act and provides that an order of the Commission "shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence." (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72.) The burden of proof is upon the person or corporation appealing the order. (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 72.)

The scope of review is limited to a determination of whether the Commission acted within the scope of its authority, whether it made findings in support of its decision, whether the findings have substantial support in the record, and whether a constitutional right has been infringed by such findings. *Carlson Transport, Inc. v. Illinois Commerce Com.* (1981), 93 Ill. App. 3d 793, 795, 416 N.E.2d 1239, 1241.

We find that there is sufficient evidence to support the Commission order granting contract carrier authority to Wells Fargo, and that the Commission's findings were not against the manifest weight of the evidence. Since we hold that the Commission properly applied the public interest test, we need not address the other issues raised by appellant Wells Fargo.

We reverse the judgment of the circuit court, and order that the Commission's order of May 16, 1979, be reinstated in full.

Reversed; Commission order affirmed.

ROMITI, P. J., and LINN, J., concur.