GRAVES TRUCKING, INC., ET AL. *v.* B. G. TRUCKING CO., INC., ET AL.

[No. 171A16. Filed April 11, 1972. Rehearing denied June 12, 1972. Transfer denied November 16, 1972.]

*Harrison, Moberly, Wallace and Gaston,* of Indianapolis, for appellants.

*Bingham, Summers, Welsh and Spillman,* of Indianapolis, for appellees.

STATON, J.—This is an appeal from an order of the Public Service Commission of Indiana which granted contract authority to Appellee, B. G. Trucking Co., Inc. The Appellants were the Protestants at the original hearing and contend in this appeal *inter alia* that the Applicant, B. and G. Trucking Co., Inc., did not meet its burden of proof for a contract permit and that the findings of the Public Service Commission are not supported by the evidence. We reverse the Public Service Commission's order and remanded this cause for further proceedings not inconsistent with this opinion which follows.

B. G. Trucking Co., Inc., filed its application with the Public Service Commission of Indiana on December 8, 1969 requesting authority to operate as a contract carrier wtih the following shippers:

Ohio & Indiana Stone Corporation; Standards Materials; F. S. Grady Products, Inc.; and F. S. Grady & Sons, Inc.

This application was later amended to haul the following described commodities:

"To haul dry asphalt, sand, gravel, dirt and crushed stone and related bulk commodities in dump trucks, except fly ash and fly ash cement blended products, coal and coke— and the rest of it—and that would be from stone and gravel quarries within a 50 mile radius of Marion County, Indiana."

A hearing was held July 1, 1970 in Room 909 of the State Office Building. The hearing examiner filed his report and recommendations on October 28, 1970. The Appellants, who shall hereafter be referred to as "Protestants" filed their exceptions to the report and recommended order. These exceptions were overruled by the Commission. Thereafter, on December 4, 1970, the Protestants filed a petition for recon-

sideration which was denied on December 24, 1970. The Protestants filed their assignment of error which is as fol lows:

"1. That the decision and orders of the Commission in recommending the authority sought by Applicant to be granted, and by overruling Protestants' exceptions and petition for reconsideration, are contrary to the law."

The Protestants filed their reply brief herein on December 2, 1971.

The Protestants contend that the applicant has failed to sustain its burden of proof as a contract carrier requesting authority under IC 1971, 8-2-7-2; Ind. Ann. Stat. § 47-1212 (Burns 1971 Supp.) and IC 1971, 8-2-7-20; Ind. Ann. Stat. § 47-1222 (Burns 1965) to provide a specific service for the distinct need of each individual shipper. The Protestants further contend in their brief that some of the findings of the Public Service Commission are not supported by the evidence.

Our examination of the entire record in this cause is limited to a determination that the order is supported by substantial evidence. *Minneapolis Van & Warehouse Co.* v. *St. Paul Terminal Warehouse Co.* (1970), 288 Minn. 294, 180 N. W. 2d 175; *Daviess-Martin Co. Rural Telephone Corp.* v. *Pub. Serv. Comm.* (1961), 132 Ind. App. 610, 174 N. E. 2d 63. The statutory requirements under consideration here are:

IC 1971, 8-2-7-20, *supra,* and IC 1971, 8-2-7-2, *supra.*

"Upon the filing of an application for contract carrier authority to operate motor vehicles in intrastate commerce, the commission shall, within a reasonable time, fix a time and place for a public hearing thereon; and the place of hearing shall be in the city of Indianapolis unless otherwise ordered by the commission. A copy of the notice of hearing shall be mailed to the applicant, at the address set out in the application, at least ten (10) days prior to the date set for hearing. Any person interested in such proceedings may appear in person, or by counsel, and offer

any evidence either in support of, or in opposition to, the granting of the authority requested in the application.

"In determining whether requested contract authority should be granted, the commission shall, among other things, consider the following factors:

(a) The financial ability of the applicant to furnish adequate contract carrier service;

(b) The effect of granting the requested authority on existing transportation, and particularly whether the granting of such authority will seriously impair such existing service. and will unreasonably impair the efficient public service of any certificated common carrier by motor vehicle, or by railroad, then adequately serving the same territory;

(c) Whether or not any certificated common carrier by motor vehicle, or by railroad, then serving the same territory, will furnish transportation services designed to meet the distinct need of the supporting contract shipper or shippers;

"If the commission shall, after hearing ascertain and determine that the proposed operation, as requested in the application, meets all of the requirements of contract carriage, as defined in this act; and that the applicant is qualified in all respects to perform such proposed operation, the commission shall approve the application and issue the requested authority, subject, however, to such terms, restrictions and limitations as the commission may determine.

"The commission shall specify and name in the permit the name of the contracting shipper, or shippers; the business of the contract carrier covered thereby; and the scope of the permit to which shall be attached at the time of issuance, and from time to time thereafter such reasonable terms, conditions and limitations consistent with the character of the holder as a contract carrier: Provided, That the provisions of this amendatory section shall in no way amend, alter or revise any contract carrier permit which has been issued by the commission prior to the effective date of this amendatory act or limit the permit holder's right to add additional contracting shippers." (IC 1971, 8-2-7-20)

"The term 'Common Carrier' shall mean any person that holds himself out to the general public to engage in the transportation by motor vehicle of passengers or property, for compensation, whether over regular or irregular routes.

"The term 'contract carrier' shall mean any person who

engages in transportation by motor vehicle of passengers or property, for compensation (other than transportation referred to in subparagraph (g) of this section), under continuing contracts with one (1) person, or a limited number of persons, either (a) for the furnishing of transportation services through the dedication of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer." [IC 1971, 8-2-7-2(g), (h)]

The thrust of the Protestants' argument is that the minimal burden of proof has not been met by the Applicant under the statute. The Applicant is a contract carrier "* * * (b) *for the furnishing of transportation services designed to meet the distinct need of each individual customer.*" (Our emphasis). IC 1971, 8-2-7-2(h), (b), *supra.* The specific failure of proof urged by the Protestants is that proof which relates to the "distinct need" as set forth in IC 1971, 8-2-7-20 (c), *supra,* and IC 1971, 8-2-7-2, *supra.* The particular provisions are as follows:

IC 1971, 8-2-7-20, *supra;*

"(c)   Whether or not any certificated common carrier by motor vehicle, or by railroad, then serving the same territory, will furnish transportation services designed to meet the distinct need of the supporting contract shipper or shippers;"

IC 1971, 8-2-7-2, *supra;*

"* * * (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

There are no reported cases in the State of Indiana which indicate fully the minimal burden of proof necessary for a contract carrier permit. Therefore, the cause before us is one of first impression. Where the statutory language is the same or similar, federal decisions may be very persuasive as authority and careful considera-

tion should be given such decisions even though they may not be binding. 20 Am. Jur. 2d, *Courts* § 225; *Sperry & Hutchinson Co.* v. *State* (1919), 188 Ind. 173, 122 N. E. 584; *Cleveland, Cincinnati, Chicago & St. Louis R. R. Co.* v. *Blind* (1914), 182 Ind. 398, 105 N. E. 483, 494; *Houston* v. *First Federal Savings & Loan Association of Gary* (1969), 144 Ind. App. 304, 246 N. E. 2d 199, 204, 205.

The Interstate Commerce Act, Title 49 § 303(a)(15) of U.S.C.A. is as follows:

"* * * or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

IC 1971, 8-2-7-20 (h), *supra,* provides:

"* * * or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

The statutory language above in both the federal and Indiana statutes is the same. Again, we find in IC 1971, 8-2-7-20 (c), *supra,* similar language.

"* * * will furnish transportation services designed to meet the distinct need of the supporting contract shipper or shippers."

How should the term "distinct need" be interpreted? We find such descriptive words as "specialized", "select", and "tailored" used in the federal cases. Discussing the proper procedure and shifting of the burden of proof, the United States Supreme Court in *Interstate Commerce Commission* v. *J-T Transport Co., Inc.* (1961), 368 U.S. 81, 82 S. Ct. 204, 7 L. Ed. 2d 147, has stated:

"The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have

the ability as well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants.

"Moreover, as we read the Act, as amended in 1957, the standard is not whether existing services are 'reasonably adequate.' It is whether a shipper has a 'distinct need' for a different or a more select or a more specialized service. The protesting carriers must show they can fill that 'distinct need,' not that they can provide a 'reasonably adequate service.'

"* * * For it is 'the distinct need of each individual customer' that the contract carrier is designed to fill. § 203 (a) (15). And 'the changing character' of the shipper's 'requirements' is a factor to be weighed before denying the application. § 209 (b). Hence the adequacy of existing services for normal needs and the willingness and ability of an existing carrier to render the service are not the end of the matter. The 'distinct need' of the shipper may nonetheless not be served by existing services, if the new service is better tailored to fit the special requirements of a shipper's business, the length of its purse, or the select nature of the delivery service that is desired. The fact that the protesting carriers do not presently perform the service being tendered and that the grant of the application would not divert business from them does not necessarily mean that the grant would have no effect 'upon the services' of the protesting carriers within the meaning of § 209 (b). But where the protesting carriers do not presently have the business, it would seem that the grant of it to a newcomer would have an adverse effect on them only in the unusual case."

The minimal burden of proof for the applicant who seeks a contract carrier permit was suggested in *John Novak Contract Carrier Application* (1967), 103 M.C.C. 555, 1970 F.C.C. ¶ 36,417. The Commission stated:

"Applicant is a motor carrier who has operated in intrastate commerce within Wisconsin for 30 years. His terminal is at Laona near the plant of the supporting shipper, and he has served this shipper satisfactorily in the past. He operates two tractors and trailers which would be assigned to the shipper's exclusive use. His fitness and ability to perform the service proposed are unquestioned.

"Supporting the application is the Connor Lumber and Land Company which has sawmills at Laona and Wakefield. Laona is in the extreme northeast portion of Wisconsin and Wakefield is near the western tip of the Upper Peninsula of Michigan. The shipper's Laona sawmill, where it produces hardwood molding and flooring, juvenile furniture, and sawdust products, employs 424 persons, and the Wakefield mill, which produces rough and finished lumber, has a payroll of between 75 and 100. The shipper's mills represent the largest single industry in each community.

"It seems likely that the supporting shipper, considering the size of its two operations, controls the routing of considerable volumes of traffic moving in interstate commerce. Unfortunately, however, the verified statement which it has submitted in support of the application contains virtually no evidence relevant to the shipper's transportation requirements. We are not told the volume of its shipments, the nature and location of its customers, the amount of freight which would be tendered to applicant, or the volume now handled by other carriers. Instead, the shipper's initial statement, after a brief account of its facilities, proceeds directly to a series of complaints about existing motor carrier service. Its rebuttal statement consists solely of the latter type of testimony. It may well be, as the shipper charges, that the transportation services available to it are totally unsatisfactory, but even assuming that this is true, its remaining testimony is not such as would enable us to ascertain its actual transportation requirements so that we could frame a grant of authority for the applicant responsive to the shipper's needs. There is no indication whether all the commodities involved move from both of the shipper's plants; whether it ships to any, a few, or many points in the seven destination States; at what representative points it has customers or has made deliveries in the past; why it supports applicant for interstate authority to operate from Laona to other points in Wisconsin and from Wakefield to other points in Michigan; or whether there is any movement of supplies and materials inbound to either of its plants.

"When applications are assigned for processing under the modified procedure, an order to this effect is issued and served on the parties. It is the Commission's practice to include with each copy of such an order a notice describing the type of evidence which applicants, supporting witnesses, and protestants should supply in order that the

Commission may have before it facts sufficient to support as well-informed decision. A copy of this notice is attached to this report as an appendix. The contents of the notice are by no means novel, and the Commission in innumerable decisions has discussed the evidence required of an application in a case such as this.

"It will be seen that the shippers and consignees supporting an application for the transportation of property are asked to 'identify clearly the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and any deficiencies in existing services.' This is the minimum showing expected of any applicant seeking a grant of motor carrier authority. It is abundantly clear that in the proceeding before us these minimum legal requirements have not been met. Applicant, therefore, has not proved a prima facie case, and the application must be denied.

"We find that applicant has failed to establish that the operation proposed would be consistent with the public interest and the national transportation policy; and that the application should be denied. An appropriate order will be entered."

The "notice describing the type of evidence" in *John Novak, supra,* referred to by the Commission as it applies to the question before us states:

"Applicant should include with its initial verified statement a copy of its pertinent operating authority, a recent financial statement, a description of the equipment to be used in the proposed operation, and evidence regarding its method of insuring compliance by its employees with the Commissioner's safety and other regulations.

"Those supporting the application should state with specificity the transportation service which they believe to be required.

"The shippers and consignees supporting applications for authority to transport property should identify clearly the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and any deficiencies in existing services."

We are of the opinion that some minimum standards of proof should be established to prevent the development of a practice whereby the supporting shippers may designate and select at will the carriers that they prefer to handle their commodities. This not only would work a great disadvantage upon the common carriers authorized to handle such commodities but would usurp the statutory duty of the Public Service Commission of Indiana and circumvent the clear intent of the Legislature. Selection of a favorite contract carrier by shippers without some standards of proof to protect the public could eventually precipitate an erosion of common carrier service to the public which the statute prohibits. Therefore, we hold that the following minimum standards of proof should be met. In addition to the testimony of each individual shipper stating the specific transportation service required to satisfy its distinct needs, each supporting shipper should testify to the following:

1. Identify the commodities shipped or received.
2. Describe the traffic movements of these commodities to and from given points or areas.
3. State the approximate volume of these commodities to be tendered the applicant.
4. State the carrier service now being used to move the shipper's traffic.
5. State deficiencies, if any, in existing carrier service to shipper.
6. Each individual shipper should state his knowledge of existing carrier service authorized to carry the commodities being considered by the Commission.

A careful examination of the application, evidence and Commission's order is now necessary to determine whether the applicant in the present case met the minimal standards of proof and made a prima facie case for a contract carrier permit. The authority requested by the applicant is shown below on a printed application form:

Applicant hereby applies for authority to operate as a (check applicable status)

( )  common car-  ( )  passengers  (x)  intrastate com-
    rier                                merce,
           of                 in
(x)  contract car-  ( )  property  ( )  interstate
    rier

by motor vehicle over regular or irregular routes, transporting persons or property, or class or classes thereof:

Asphalt, sand, gravel, dirt and crushed stone, and related bulk commodities.

From _____ To _____ , or
Between    all points    and    places in Marion County  , and sand, gravel, dirt, crushed stone and related bulk commodities from stone and gravel quarries within 50 miles of Marion County to points in Marion County.

If a contract carrier, specify the business to be covered by the permit and the scope thereof:

To haul asphalt, sand, gravel, dirt and crushed stone and related bulk commodities between all points and places in Marion County and sand, gravel, dirt, crushed stone, and related bulk commodities from stone and gravel quarries within 50 miles of Marion County to points in Marion County.

Application is for a permit, name the contracting shippers:

| NAME | ADDRESS | CLASS OF PROPERTY TO BE TRANSPORTED |
|---|---|---|
| Ohio & Indiana Stone Corp., Indpls., Indiana | | Described above |
| Standard Materials, Indianapolis, Indiana | | Described above |
| F. S. Grady Products, Inc., Indpls., Indiana | | Described above |
| F. S. Grady & Sons, Inc., Indianapolis, Ind. | | Described above |

The printed application with blanks to be filled in shows that the applicant has omitted the designation of whether he intends to carry passengers or property. However, from the evidence that we find in the record, it is clear that he intended to haul property. The commodities were amended at the commencement of the hearing as follows: "To haul dry asphalt, sand, gravel, dirt and crushed stone and related bulk commodities in dump trucks, * * *." Whether "related bulk commodities" is a specific commodity is not decided here. We next note that the shippers named in the application vary from the shippers named in the Examiner's "Report and Recommended Order." It names in addition to those set forth in the application Hoosier Aggregate Company, Waverly Asphalt & Paving Co., Inc. and Hopkins Construction Co. The Ohio and Indiana Stone Corporation is mentioned as a shipper in the application. Its witness, Charles E. Stimming, testified at the hearing. Ohio and Indiana Stone Corporation's temporary contract with the applicant for one year was introduced and admitted into evidence. The Examiner's Recommended Order recited Charles E. Stimming's testimony in its order before making certain findings, but Ohio and Indiana Stone Corporation is not mentioned as one of the shippers in the Examiner's Recommended Order to grant authority. We further note that the shipper, Standard Materials, is now known by the name and style "Concrete Material Division of Martin-Marietta Corporation." This evidence was given during the testimony of applicant's witness but the application has not been so amended.

We turn now to the testimony given by each and every witness presented by the Applicant. The contracts offered in evidence during the testimony of Patrick L. Grady are very little assistance since their reference to commodities are quite general and the volume set forth therein refers only to a minimum of 200,000 pounds. Mr. Grady did identify the commodities as amended.

The first witness offered by the Applicant was William T.

Olson, Sales Manager of Concrete Materials Division of Martin-Marietta Corporation. This witness, like all of the witnesses presented by the Applicant, failed to identify the commodities which they intended the applicant to carry for them. Traffic movement from and to various points within the area designated were not brought out on direct examination but were completely covered on cross examination. Nothing is shown in the record as to the volume intended to be tendered to the applicant if the permit is granted. It may be assumed from the contract exhibits that it will be at least 200,000 pounds, but this alone leaves much to be desired if the Commission is to carry out its statutory duties to the public. He did testify as to the deficiencies in the existing service by stating the following answer to the question which precedes it:

"Q. During this surge period that you described earlier, do you know if there are existing shippers that can furnish the transportation service as needed by Concrete Materials?

"A. Carriers. During the surge period, I say 'No' because during those periods all of the common carriers are hauling for others as well as for us, and the contract carriers are busy hauling for us, and during the peak periods there is just a shortage of trucks."

The only testimony that we find regarding tonnage as to Mr. Olson is as follows:

"I am not going to tell you our tonnage in Marion County unless I am ordered to do so."

Mr. Olson was never ordered to state the volume or tonnage of his company in Marion County. When asked regarding the volume of commodities hauled by shipper Skinner, Mr. Olson testified:

"I can't answer that."

We think that the testimony of Mr. Olson as it relates to the volume of commodities to be tendered to the applicant and

as it relates to the identity of the commodities leaves something to be desired.

Applicant's next witness, Charles E. Stimming, Executive Vice President of the Ohio and Indiana Stone Corporation, failed to testify at all regarding the identification of the commodities and as to volume and traffic movements, his testimony is limited to the following:

"Q. Does your company have a volume of products to be hauled?

"A. Yes, we do, from a quarry at Cloverdale, Indiana."

As to the carrier service now being used by the shipper, he testified only very generally:

"Q. Do you have any idea how many carriers now exist with authority to transport these materials from Cloverdale to points in Marion County?

"A. The principal ones that we use—Well, the principal one that we use would be Southard.

"Q. That was not my question, sir. Do you know how many carriers now have authority to perform such service?

"A. No, I do not.

"Q. Do you know that there are certain carriers who have authority to transport these commodities between all points in the State of Indiana?

"A. Yes.

"Q. So, then, by virtue of that you do know that there are some others, if you do not know their names?

"A. That is right.

"Q. Have you made any effort through this Commission to determine what the names of these carriers are?

"A. No, I have not."

As to the volume to be tendered to the Applicant so that some determination may be made as to what utilization of the applicant's equipment this particular shipper might make, this testimony was offered:

"Q. Has B.G. guaranteed you any number of units at any particular time should this authority be granted?
"A. No."

There is absolutely no substantial evidence regarding any deficiency in the service to this shipper.

The next witness offered by the applicant was Frank McClure, President of Hoosier Aggregate Company, Inc. and Waverly Asphalt and Paving Company. His testimony reveals that the only attempted identification of the commodities to be hauled is:

"Q. And what type of business is Waverly Asphalt—What kind of things does Waverly Asphalt do?
"A. Asphalt paving.
"Q. And in that business do you have a need for trucks?
"A. Yes.
"Q. And how about Hoosier Aggregates? What sort of business are they in?
"A. Gravel products.
"Q. And does Hoosier Aggregates have a need for trucks?
"A. Yes."

Mr. McClure's testimony as to the volume of the commodities is next to non-existent:

"Q. Does either one of the two—[Waverly Asphalt and Hoosier Aggregates]—What sort of volume of materials to be shipped would Hoosier Aggregates have?
"A. I would not have those figures available now."

His testimony regarding carriers now being used is quite general and vague. His testimony in this regard is as follows:

"Q. And when are trucks other than those used, other than those of Waverly Asphalt and Hoosier Aggregates? When are other trucks used by either one of the companies?
"A. As our sales demand."

* * *

"Q.    Is it very often that you use other trucks other than your own?

"A.    Yes."

However, on cross examination by Mr. LeMay, Mr. McClure testified as follows:

"Q.    You didn't use any certificated carrier in 1967 or 1968, did you?

"A.    Not as such.

"Q.    You didn't use any last year either, did you?

"A.    Perhaps not as a direct, but indirect through deliveries from the quarries."

Mr. McClure did not testify at all regarding any acknowledged deficiencies in the present service except for that set forth above. There was no testimony on the part of Mr. McClure regarding his knowledge of existing carrier service. In like manner, we find a complete void of any testimony relating to traffic movements of his unidentified commodities.

The next and final witness for the applicant was Arvin M. Hopkins, who is self-employed as Hopkins Construction Company. He testified as follows:

"Q.    And what sort of business is Hopkins Construction in.

"A.    Well, I do a little sewer work, and water lines, and I have a little gravel pit.

"Q.    And does Hopkins Construction Company occasionally have the need for the use of dump trucks?

"A.    Occasionally, yes.

"Q.    To do what?

"A.    Well, since I started the gravel pit, which I am just new at, for truck rental to haul aggregates.

"Q.    And has Hopkins Construction Company signed a Contract of Carriage with B. G. Trucking Company?

"A.    Yes, it has.

"Q.    Has B. G. done any hauling for you?

"A.    Not as of yet, no.

"Q.    Have you had any need for hauling?

"A. Not as of yet. I have the materials sold, but the jobs won't let me in.

"Q. Do you anticipate a need for trucks, though?

"A. Yes, sir."

CROSS-EXAMINATION,

QUESTIONS BY MR MOBERLY:

"Q. Do you have any idea how many motor carriers have authority to serve Mooresville?

"A. No, I don't.

"Q. You haven't investigated that question either, have you?

"A. No, I haven't.

"Q. You have not contacted this Commission to discover who might be able to serve your pit?

"A. No, I have not."

Mr. Arvin M. Hopkin's testimony has obviously established nothing.

Finding No. 5 of the Public Service Commission's order:

"That the evidence reflects a need for a carrier to haul on short notice and in small quantities and that the Applicant proposes to fulfill this need on behalf of its supporting shippers, all of which is in the best interests of an efficient transportation system, * * *"

is not supported by substantial evidence in the record. The "hypothetical" questions put to Protestant Charles C. Graves, as well as other Protestants, and the "hypothetical" answers given by them are not sufficient evidence to establish a "distinct need" as to each of the individual shippers.

Therefore, the order of the Public Service Commission of Indiana should be and the same hereby is reversed and remanded for further proceedings not inconsistent with this opinion.

Hoffman, C.J., concurs in result; Sharp, J., concur.

NOTE.—Reported in 280 N. E. 2d 834.