**GRAVES TRUCKING, INC., Statewide Trucking, Inc., and Klink Trucking, Inc., Appellants (Protestants Below),**

v.

**PUBLIC SERVICE COMMISSION OF INDIANA, State of Indiana, and Black Beauty Trucking Co., Inc., Appellees.**

**No. 2–185A2.**

Court of Appeals of Indiana,
Third District.

March 24, 1986.

Robert B. Hebert, Miller, Faires, Hebert & Woddell, P.C., Indianapolis, for appellants.

Alki E. Scopelitis, Lynne D. Lidke, Scopelitis & Garvin, Indianapolis, for appellees.

GARRARD, Judge.

This appeal is from a Public Service Commission of Indiana (Commission) decision issuing a certificate of public convenience and necessity (certificate) authorizing Black Beauty Trucking, Inc. (Black Beauty) to operate as a common carrier.

Black Beauty initially sought a certificate authorizing the transportation of bulk commodities in dump trucks throughout all of Indiana. Nineteen (19) other carriers filed protests in response to Black Beauty's application. A public hearing before an administrative law judge extending over several days was concluded on April 12, 1984, after which four (4) of the protesting carriers withdrew their opposition. Black Beauty subsequently filed a motion with the Commission to restrictively amend its application on October 2, 1984. After the restrictive amendment five (5) more carriers withdrew their opposition to Black Beauty's application.

The administrative law judge then submitted his report and recommendation to the Commission supporting approval of the restricted application. Of the remaining, protesting carriers Graves Trucking, Inc. Statewide Trucking, Inc. and Klink Trucking, Inc. (collectively referred to as Protestants) were the only carriers formally objecting to the report and recommendation. Protestants submitted exceptions and a

supporting brief to the Commission. After Black Beauty submitted a response to the exceptions, the Commission approved the application on January 3, 1985, granting Black Beauty authority as follows:

"IT IS THEREFORE ORDERED BY THE PUBLIC SERVICE COMMISSION OF INDIANA THAT:

1. A Certificate of Public Convenience and Necessity be issued to Black Beauty Trucking, P.O. Box 312, Evansville, Indiana 47702, to operate motor vehicles as a common carrier of property, intrastate, subject to the terms, conditions and limitations hereafter set out, as follows, to-wit:

*Commodities in bulk, in dump vehicles,*

Between points in Indiana.

(1) RESTRICTED against the transportation of cement, scrap metal, pig iron, coke, alloys and salt.

(2) RESTRICTED against the transportation of fertilizer from Frichton, Delphi, Mt. Vernon (Posey County) and from the facilities of Kaiser Industrial Chemicals at Burns Harbor.

(3) RESTRICTED against any transportation having *both* an origin and destination within:

(a) Lake and Porter Counties;

(b) Boone, Hamilton, Hancock, Hendricks, Johnson, Marion, Morgan and Shelby Counties;

(c) Miami, Wabash, Howard, Grant, Cass and Fulton Counties."

Protestants now seek appellate review of the Commission's order contending in their single assignment of error that the order is contrary to law. Under IC 8–1–3–1, which discusses appellate review of Indiana Public Service Commission decisions, an assignment of error that a commission decision is contrary to law presents for appellate review "both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was entered." *See also Coastal Tank Lines, Inc. v. Propane Transport* (1981), Ind.App., 416 N.E.2d 440. This "two-ti-

ered" standard of review was analyzed by Judge Sullivan in *Board of Directors for Utilities v. Office of Utility Consumer Counselor* (1985), Ind.App., 473 N.E.2d 1043, wherein it was determined:

"The basic findings, however, must provide the underlying reasons from which the ultimate findings or conclusions will reasonably flow. As stated by the Indiana Supreme Court, '[the] findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim.' *Perez [v. United States Steel Corp.], supra* [ (1981), Ind.], 426 N.E.2d [29] at 33. A finding is insufficient if in fact it is merely a summary or recitation of the evidence which does not manifest the Commission's expertise in analyzing such evidence. *Talas v. Correct Piping Co.* (1981), Ind., 426 N.E.2d 26, 28.

At the second level of review, the Court determines whether the Commission's basic findings of fact are supported by substantial evidence of record. *Capital Improvement Board v. Public Service Commission* (2d Dist.1978), 176 Ind.App. 240, 245, 375 N.E.2d 616, 622. In this respect, the court is not empowered to substitute its judgment for that of the Commission and where a reasonably sound basis of evidentiary support exists, the Commission's findings will be upheld. *L.S. Ayres & Co. [v. Indianapolis Power & Light Co.], supra* [ (2d Dist. 1976) ], 169 Ind.App. [652] at 664, 351 N.E.2d [814] at 823."

473 N.E.2d at 1047. Guided by IC 8–2–7–15(b) and this standard of review, we now examine the Commission's decision and its evidentiary foundation.

IC 8–2–7–15(b) requires motor carriers applying for a certificate of public convenience and necessity to establish by a preponderance of the evidence: (1) "that public convenience and necessity requires the proposed operation" and (2) "that the proposed operation will not unreasonably impair the existing public service of any au-

thorized common carrier...." We have indicated many times that the public convenience and necessity determination must be left to the informed discretion of the Commission as it necessarily depends upon the facts and circumstances of each given case. *Ram Broadcasting of Ind. v. MCI Airsignal* (1985), Ind.App., 484 N.E.2d 26, 30; *Coastal Tank Lines, Inc. v. Propane Transport* (1981), Ind.App., 416 N.E.2d 440, 443; *Jack Gray Transport, Inc. v. Public Service Comm.* (1978), 177 Ind.App. 576, 380 N.E.2d 1250, 1254; *V.I.P. Limousine Service, Inc. v. Herider-Sinders, Inc.* (1976), 171 Ind.App. 109, 355 N.E.2d 441, 444–6.

Protestants' challenge of the Commission's decision focuses on the public convenience and necessity component of Black Beauty's burden of proof. Protestants contend that there is no substantial evidence in the record to justify the territorial scope of Black Beauty's certificate, the commodity scope of the certificate or the fitness, willingness, or ability of Black Beauty to provide the proposed service. The Commission's findings regarding these three areas, while extensive, merit repetition here:

"Turning to the evidence, the detailed evidence submitted by Applicant convincingly demonstrates that Applicant is capable of providing the proposed service. Applicant operates a large dump vehicle fleet and has invested substantially over the past few years in increasing the size of that fleet in order to meet the needs of its customers. Further, Applicant's past service demonstrated that it has provided extensive dry bulk service throughout much of the state, including movements as far north as Cass County as far east as Wayne County. Applicant's detailed traffic study, submitted as Appendix H to Applicant's Exhibit 1, shows that Applicant, pursuant to its past authorities, already is competing throughout much of the state with respect to the transportation of several dry bulk commodities, including coal, stone, sand, gravel, lime and fertilizer, as well as exempt commodities. Protestants, especially those remaining in the case, made no real effort to show that Applicant was unable to provide the proposed service.

At the very start of this proceeding, Applicant made clear its intention to establish public convenience and necessity by submitting its own evidence, as well as shipper support evidence. Applicant's 1983 operations had its equipment moving thousands of shipments of coal from points located in the southern and southwestern part of the state to numerous other counties (Applicant's *Exhibit 1*, Appendix H). In comparison, Applicant had much fewer return movements back to its base of operations in southwestern Indiana, loaded; therefore, substantial deadhead mileage was incurred. (Applicant's *Exhibit 1*, Exhibit H). The primary purpose of the application is to reduce the number of empty return movements, thereby increasing the efficiency of Applicant's operations. Applicant proposes to pass on this cost saving by filing with the Commission a rate that will enable the shipping public to take advantage of two-way loaded movements (Applicant's *Exhibit 1*, Appendix J).

It is the declared policy of the Act to promote 'economical and efficient service and foster sound and economic conditions....' I.C. 8–2–7–5. Moreover, public need must be considered in an economic and social sense. *In Re Allen d/b/a Indiana Scenic Bus Line Tours*, No. 2367–A, 3 (1946). The Commission finds Applicant's goal to obtain two-way movements to be feasible and, because of the lower rates to be offered, in the public interest. The Commission points out that the mere promise by an applicant of a lower rate may not be probative in another application proceeding, but Applicant established through its evidence and the evidence of the supporting shippers that the increased capability of Applicant to provide the proposed service in the application territory will be in the public interest. That showing was made through Applicant's witness' testimony and the traffic study and tariff proposal

submitted, which evidence was consistent with the related testimony of the supporting shippers.

The evidence submitted by the supporting shippers also supported the amended commodity scope. The shipper evidence involved a wide assortment of dry bulk commodities, including coal, sand, gravel, agricultural limestone and stone. Applicant need not submit evidence as to all types of bulk commodities, but only a representative number. *Central Transport, Inc.*, [P.S.C. Cause No. 8910–A, 5 (August 1, 1984)]. Further, Applicant's equipment and method of operation are designed to handle bulk commodities in dump vehicles, and a narrow commodity grant would only result in inefficient use of its resources. See *Central Transport, supra.* Lastly, the Commission notes that Applicant has already restricted its application against the transportation of certain bulk commodities in order to satisfy the interests of many of the Protestants.

In regard to the territorial scope, Applicant's evidence justified the territorial scope, especially in light of its restrictive amendment. Applicant submitted a traffic study showing that it already has dump vehicle equipment moving as far north as Newton and Miami Counties, as far east as Wayne County, as far south as Spencer County and as far west as Vigo County. Further, its past service has involved numerous Indiana counties (Applicant's *Exhibit 1*, Appendix H). Further, the supporting shippers testified that they had extensive geographical needs, with some shippers, such as Solar Sources, requiring service throughout the state. (Statement of Solar Sources, Applicant's *Exhibit 2*, at 2).

Although there was not substantial evidence submitted in regard to certain parts of the state, such as the southeastern and the far northern parts of the state, an applicant need only show a need for service at several *representative* points. *Daum Over-Night Express, Inc.*, PSCI No. 13289–A, 1. The evidence submitted by Applicant and the supporting shippers was sufficient, in absence of evidence to the contrary, of a need for service in the application territory. The Commission points out that several of the supporting shippers emphasized that their geographical transportation needs were increasing, and that further limiting the territorial scope beyond the restrictions therein would only frustrate Applicant's goal of increasing the efficiency of its operations.

"The supporting shippers also submitted a number of reasons as to why they required the proposed services. As previously summarized, those reasons included shortages of equipment, increased transportation needs, and more attractive rates. Although some evidence, such as that submitted by the witness for IPL, was general in nature, collectively the evidence established the need for the additional services of Applicant in the restricted application territory. In weighing the evidence submitted by the supporting shippers, the Commission gives substantial weight to evidence involving service failures, such as lack of equipment, but also gives weight to the evidence to such factors as those involving increased transportation needs and the need for more competitive rates."

*Territorial Scope*

 As Protestants point out, Black Beauty did not submit any evidence concerning the public need for its services in the northeast corner of the state. The Commission conceded that certain portions of the state were not supported by substantial evidence but concluded that an applicant need only present evidence concerning representative points throughout the territory for which authority is sought. This representative showing of public need has been interpreted by the Commission as raising "a rebuttable presumption of a need for extended service for those points for which no testimony was offered." *Daum Over-Night Express, Inc.*, P.S.C. Cause No. 1 3289–A, 1 (June 22, 1982).

Although there are no Indiana appellate decisions discussing the representative showing of public need standard, the federal courts have used the standard in reviewing the grant of certificates of public convenience and necessity by the Interstate Commerce Commission to interstate motor carriers. In *Graves Trucking, Inc. v. B.G. Trucking, Inc.* (1972), 151 Ind.App. 563, 280 N.E.2d 834, we indicated that:

> "Where the statutory language is the same or similar, Federal decisions may be very persuasive as authority and careful consideration should be given such decisions even though they may not be binding."

280 N.E.2d at 837 (citations omitted). Prior to the passage of the Motor Carrier Act of 1980 (49 U.S.C.A. Section 10101 et seq.), which substantially changed the federal application procedure for certificates of public convenience and necessity, the Indiana intrastate application procedure (IC 8–2–7–15) was similar to the federal interstate application procedure (49 U.S.C. Section 307(a) (1970)). We will thus limit our discussion to those federal cases decided under the law as it existed prior to the enactment of the Motor Carrier Act of 1980.

In *May Trucking Co. v. United States* (D.C.Cir.1979), 593 F.2d 1349, the motor carrier applicant sought authority to operate in Idaho, Montana, Oregon and Washington. In opposing the I.C.C.'s decision to grant the authority, May Trucking argued that very little evidence was tendered showing public need for southern Idaho. The court concluded:

> "On the other hand, there is no requirement that data on need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate of such encompassing scope may be awarded. Were it otherwise, certificates would be cumbersome and perhaps confusing; carriers often could not assure themselves of the economy of full

loads and backhauls; and the Commission would be denied the normally reasonable inference that what is true for a fair sampling of localities is probably true for most. Thus, all that is required is evidence portraying the situation at a representative number of points."

593 F.2d at 1353 (footnote omitted). The court went on to address the problem of inferring public need for service in southern Idaho on the basis of evidence of deficient service in northern Idaho as being speculative:

> "It must be remembered, however, that in fashioning operating authorities the Commission has to chart boundaries, a matter involving numerous practical considerations. This kind of line-drawing is to be left to the agency's judgment unless 'patently unreasonable.' What was necessary here, but all that was necessary, was enough of a presentation specifically related to points in southern Idaho to enable an informed decision by the Commission on Ayala's request to serve that area."

593 F.2d at 1353–4 (footnotes omitted).

In *Miller Transporters, Inc. v. United States* (5th Cir.1979), 594 F.2d 463, a motor carrier applicant sought authority to transport petroleum products throughout Alabama, Florida and Georgia. Two opposing carriers argued that the applicant's evidence concerning eleven (11) Alabama supply points would not support authority for the whole state because such evidence did not represent a majority of the supply points. The court concluded that the I.C.C. was entitled to conclude that the supporting shipper testimony concerning public need at the eleven (11) points was representative of needs throughout Alabama. After discussing several other cases using the representative showing of need standard,[1] the court concluded:

---

**1.** The cases cited in *Miller Transporters, Inc.,* *supra,* all endorsed the representative showing of public need approach: *Midwest Coast Transport, Inc. v. I.C.C.* (8th Cir.1976), 536 F.2d 256, 260 (representative points in Minnesota and Wisconsin were sufficient to justify authority over the entire area of those two states); *National Trailer Convoy, Inc. v. United States* (N.D. Okla.1973), 381 F.Supp. 878, 882 (representative points held sufficient to justify nationwide au-

"We decline to play a numbers game designed to devise a precise formula as to whether evidence of the need for service at 10 points is enough to justify service at 20 or 30 more. It would have been an unreasonable burden to require McKenzie to adduce proof concerning even a majority of the many small towns in Alabama already served by Miller and Chem-Haulers. McKenzie produced public witnesses who complained of the existing service of Miller and Chem-Haulers and who contemplated additional future requirements. The decision by the Commission based on that substantial evidence to grant all points authority within Alabama was not arbitrary or capricious."

594 F.2d at 467.

We find these federal decisions using the representative showing of public need approach with its underlying theme of efficiency to be very persuasive. Further, the Commission's past use of the representative showing approach in *Daum Over-Night Express, supra,* coupled with our repeated deference to the Commission's fact and circumstance specific public convenience and necessity determination supports the Commission's use of the representative showing approach in the present case. The Commission, using the representative showing method, found that:

"The evidence submitted by Applicant and the supporting shippers was sufficient, in absence of evidence to the contrary, of a need for service in the application territory."

The statewide grant of authority to Black Beauty was supported by the Commission's basic findings regarding territorial scope.

*Commodity Scope*

■ Similar to the Commission's determination with regard to territorial scope, Black Beauty's representative showing concerning several bulk commodities was found sufficient to warrant the broad commodity scope of "commodities in bulk, in dump vehicles." Specifically the Commission found that narrowing the commodity scope would be inefficient for Black Beauty in that one of the main reasons for seeking a broad community scope is to insure full back hauls. In other words, Black Beauty could negotiate to transport some bulk commodity between two points on the trip back from a front haul of coal; limiting the commodities Black Beauty could carry would greatly decrease the opportunity to back haul.

The Commission recently approved a broad commodity grant based on a representative showing of public need as to several commodities in *Central Transport, Inc.,* P.S.C. Cause No. 8910–A, 5 (August 1, 1984). In *Central Transport,* the Commission adopted the rationale of the Interstate Commerce Commission for granting broad authority based on a representative showing, as follows:

"The commodity description approved by the review board reflects a need for applicant's service in the transportation of small shipments consisting of a wide range of diverse commodities. Where the record substantiates the appropriateness thereof, this Commission favors the granting of broad rather than narrow commodity authorizations *so as to allow applicant carriers to perform a complete service in meeting the present and reasonably foreseeable future transportation needs* of the shipping public. Thus, in cases where an applicant establishes that there is a need for its service in the carriage of a *representative* num-

thority); *American Trucking Associations, Inc. v. United States* (W.D.Tex.1973), 373 F.Supp. 252, 256 (representative showing throughout area sought raised rebuttable presumption that need shown extended to those points for which there was no testimony); *Hudson Transit Lines, Inc. v. United States* (D.N.J.1970), 314 F.Supp. 197, 202 (area for which authority sought should be considered as a whole, permitting inference that

conditions existing at representative points in that area existed generally throughout); *Atlanta-New Orleans Motor Freight Co. v. United States* (N.D.Ga.1961), 197 F.Supp. 364, 368 (evidence showing public need for 22 out of 150 geographical points in the sought after area of authority held to be sufficient representative showing as requiring evidence from every point would be unreasonable).

ber of commodities belonging to a certain generic class, this Commission regularly grants authority to transport all commodities belonging to that class." (emphasis in original)

*Central Transport, supra,* at p. 11 (citing *Comet Messenger and Delivery Service, Inc., Common Carrier Application,* 111 M.C.C. 13, 16 (1970)).

The Commission specifically found that the testimony of the supporting shippers "involved a wide assortment of dry bulk commodities" The Commission also noted that Black Beauty's amended application restricted the commodity scope by deleting cement, scrap metal, pig iron, coke, alloys and salt from the authority sought. The Commission's basic findings and their reasoning concerning the commodity scope supports the decision to grant authority as to bulk commodities transported by dump vehicles.

We have determined that the Commission's basic findings regarding territory and commodity scope support the Commission's decision to grant Black Beauty statewide authority to transport bulk commodities in dump vehicles. The next step in our review of the Commission's decision is to determine whether these basic findings are supported by substantial evidence found in the record. IC 8–1–3–1; *Board of Directors for Utilities, supra.* A review of the evidence leads us to the conclusion that the basic findings are aptly supported by the substantial evidence submitted in support of Black Beauty's application.

Black Beauty submitted a detailed traffic study of its truckload shipments for 1983, which included 10,000 intrastate shipments in Indiana and identified over thirty (30) counties as origin and/or destination points for these shipments. Several supporting shippers also testified concerning the origin and destination points of their products within Indiana covering the counties mentioned in Black Beauty's traffic study and adding several more. The traffic study prompted the Commission to find that Black Beauty "already has dump vehicle equipment moving as far north as Newton

and Miami Counties, as far east as Wayne County, as far south as Spencer County and as far west as Vigo County." (*In the Matter of Black Beauty Trucking Co.,* P.S.C. Cause No. 14055–A, 4 (January 3, 1985) R. at 288).

Black Beauty's application was also supported by the testimony of seven shipper witnesses representing six different companies. Several additional counties were specifically identified by three of these companies as current origin and/or destination points for which the services of Black Beauty would be used. Between the 1983 traffic study and the testimony of the supporting shippers, close to half of Indiana's counties were included in Black Beauty's representative showing of public need.

Solar Sources, Inc. is engaged in the mining and selling of coal. In addition to needing the services of Black Beauty for the transportation of its coal from mines located in southwest Indiana to points throughout Indiana, Solar Services needs a substantial amount of crushed stone at their mining facilities which they feel could be delivered by Black Beauty on a back haul basis after front hauls of coal. Solar Sources emphasized the economic efficiency of being able to combine front hauls of coal and back hauls of stone. Finally, Solar Sources indicated that Black Beauty's services were necessary in light of past equipment shortages of other carriers and declining rail service.

Public Service of Indiana is a major supplier of electricity in Indiana which also needed the services of Black Beauty for the transportation of coal and stone. PSI indicated that anticipated shifts in the origin points for both coal and stone shipments substantiates their need for Black Beauty to have a flexible territorial scope. PSI has experienced equipment shortages in the past and also anticipates an increase in demand for its services necessitating shipments above current levels indicating that Black Beauty's proposed operation would not unreasonably impair the existing public service of other authorized carriers. PSI indicated that it was also investigating

front hauls of coal combined with back haul movements of stone, ash, waste and sludge.

Robert Jones, general manager of two sand companies, testified that these companies were owned by the Rodgers Group, a conglomerate of companies engaged in the contracting and supplying of aggregates, asphalt, concrete and building supplies. Jones' testimony centered on the inability of other common carriers in southwestern Indiana to provide the necessary equipment and on the prohibitive rates charged by these other carriers due to incompatible geographic patterns. More specifically Black Beauty would be tendered shipments moving in north to south direction on a back haul basis after transporting coal for other customers to avoid "dead hauls" or trucks returning to southwest Indiana empty. Jones indicated the ability of Black Beauty to avoid dead hauls would increase the efficiency of Black Beauty's operation and result in decreased rates allowing Rodgers Group to expand their market area necessitating additional motor carrier service. Commodities focused upon by Jones for which Black Beauty's service was needed were stone aggregates, sand, gravel and agricultural limestone.

Carl Fletcher, area manager of Newton County Stone, also a subsidiary of the Rodgers Group, testified concerning Newton County Stone and three other Rodgers Group companies. These operations involved shipments of sand, gravel, agricultural limestone and crushed stone between the four facilities and numerous points in northwestern and west central Indiana. Fletcher also testified to past equipment shortages and increased demand for his companies' products as creating a substantial need for the services of Black Beauty. The economic efficiency and advantageous back haul rates Black Beauty's expanded service would result in was important to Fletcher as his companies would provide back haul loads to Black Beauty destined south after front hauls of coal are made to the north.

Contract Mining has used Black Beauty's limited service for transporting coal and supports the application for extended service to take advantage of back hauls of crushed stone and agricultural limestone for reclamation purposes at their mines. The lower rates Black Beauty could charge by eliminating dead hauls with an extensive back haul service was also cited by Contract Mining. Equipment unavailability with other carriers was another reason Contract Mining supported the application.

Black Beauty Coal uses Black Beauty as a contract carrier throughout much of Indiana for the delivery of coal. Continued growth of Black Beauty Coal would result in the increased use of Black Beauty. Further, Black Beauty Coal endorsed Black Beauty's attempt to substantially increase back hauls in order to operate more efficiently and provide reduced rates.

Indianapolis Power and Light supported Black Beauty's application primarily because it perceived that its customers would ultimately benefit from lower rates produced through additional back hauls, increased efficiency and increased competition in the motor carrier industry. Although Black Beauty was already providing service to IPL in the transportation of coal, IPL did not directly indicate that it would make use of any extended service obtained by Black Beauty's application.

Taken together the testimony of the supporting shippers as well as the evidence submitted by Black Beauty itself clearly supports the findings of the Commission in regard to territory and commodity scope. Counties representing over half of the state were specifically identified as origin and/or distribution points. Further, Solar Services indicates that its coal was in great demand and that they needed service throughout the state. PSI supported statewide authority because they anticipated shifts in origin points for coal and stone. Commodities specifically identified by the shippers included: coal, crushed stone, agricultural lime, sand, gravel, asphalt and ready-mixed concrete. PSI also indicated it was investigating two-way movements

which would involve commodities such as fly ash, waste and sludge. All this evidence provides substantial support for the Commission's basic fact findings which we will not now disturb on appeal.

Finally, Protestants contend that there is no substantial evidence to establish that Black Beauty is fit, willing and able to provide the service for which it seeks authority. Protestants argue that the Commission should be required to enter an affirmative finding that an applicant is fit, willing and able. In support of their position Protestants argue that IC 8–2–7–32, which empowers the Commission to amend, revoke or suspend a carrier's authority for a wilful failure to comply with the Motor Carrier Act or any Commission rule or regulation, should require consideration of a carrier's fitness, willingness and ability to serve at the application level.[2] Protestants also cite IC 8–2–7–23(a) which requires all common carriers to provide safe and adequate service as necessitating the consideration of a carrier's fitness, willingness and ability to serve at the application level.

█ IC 8–2–7–15, authorizing the grant of certificates of public convenience, does not require the Commission to make a specific finding regarding an applicant's fitness, willingness and ability. IC 8–2–7–15(d)(1) only suggests that the Commission may *consider* the financial ability of the applicant to provide the requested service.

█ In spite of the fact that the Commission was not mandated to enter a finding concerning Black Beauty's fitness, willingness and ability, it did in fact state:

"Turning to the evidence, the detailed evidence submitted by Applicant convincingly demonstrates that Applicant is capable of providing the proposed service. Applicant operates a large dump vehicle fleet and has invested substantially over the past few years in increasing the size of that fleet in order to meet the needs of its customers. Further, Applicant's past service demonstrated that it has provided extensive dry bulk service throughout much of the state...."

Our review of the record convinces us that the Commission's finding in this regard is aptly supported by substantial evidence.

In light of the foregoing, it is clear that the Commission's decision to grant Black Beauty the authority it sought was based on findings of basic fact reflecting the Commission's detailed analysis of the evidence in conjunction with the applicable statutory and case authorities. In reviewing the sufficiency of the evidence to support these basic findings we will not substitute our judgment for that of the Commission nor will we reweigh the evidence. *See Habig*, 466 N.E.2d at 487; *Coastal Truck Lines*, 416 N.E.2d at 444. As we have determined that the evidence overwhelmingly supports the basic findings of the Commission, we affirm the Commission's decision to grant Black Beauty a certificate of public convenience and necessity.

Affirmed.

STATON, P.J., and HOFFMAN, J., concur.

---

**2.** Protestants cite to *Habig Trucking and Excavating, Inc. v. Public Service Commission of Indiana* (1984), Ind.App., 466 N.E.2d 484 regarding the amendment of a broad authority grant due to lack of use by the carrier. In *Habig* we determined that the question was whether there was a wilful failure to serve portions of the state originally granted in Habig's certificate meriting restriction of Habig's authority. Furthermore, we concluded that whether or not public convenience and necessity for extensive service still existed was not part of the determination under IC 8–2–7–32.